912 A.2d 1278

**RAG (CYPRUS) EMERALD RESOURCES, L.P.**

**v.**

**WORKERS' COMPENSATION APPEAL BOARD (HOPTON),**

**Appeal of Ronald A. Hopton.**

Supreme Court of Pennsylvania.

Argued Sept. 13, 2005.

Decided Jan. 11, 2007.

414

James M. Jacobs, Esq., Somerset, for Ronald A. Hopton.

Thomas C. Baumann, Esq., Lawrence R. Chaban, Esq., Pittsburgh, for Pennsylvania Trial Lawyers Association.

Amber Marie Kenger, Esq., Richard C. Lengler, Esq., Harrisburg, for Workers' Compensation Appeal Board.

Richard Ejzak, Esq., Valerie S. Faeth, Esq., John Mark Pierce, Esq., Pittsburgh, for RAG (Cyprus) Emerald Resources, L.P.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

416 

## OPINION

Justice BAER.[1]

We granted allowance of appeal in this workers' compensation case to decide whether the Commonwealth Court erred or abused its discretion in reversing the Workers' Compensation Appeal Board's (WCAB) decision affirming the Workers' Compensation Judge's (WCJ) conclusion that Appellant Ronald A. Hopton (Claimant) was entitled to workers' compensation benefits pursuant to the Workers' Compensation Act[2] as a result of an alleged aggravation of his pre-existing post-traumatic stress disorder (PTSD). We hold that the WCAB's and WCJ's decisions were proper and consequently reverse the Commonwealth Court's order.

■ On April 12, 1996, Claimant filed a claim petition against Appellee RAG (Cyprus) Emerald Resources (Employer) seeking various benefits for a disabling psychological injury that he suffered in July 1994.[3] Claimant further alleged that this injury occurred because he "was subject[ed] to harassing comments of a homosexual nature by the employees [sic] mine foreman, Dominic Rossi, on three occasions from July 6 to 13, 1994." Claim Petition, Supplemental Reproduced

1. This case was reassigned to this author.

2. Workers' Compensation Act, Act of June 2, 1915, P.L. 736, as amended, 77 P.S. §§ 1 et seq. (hereinafter "Act").

3. Specifically, Claimant alleged that he suffered an "[a]ggravation of a prior existing condition (Post–Traumatic Stress Disorder, PTSD), resulting in a debilitating anxiety attack, rage, anger, depression and physical pain." Supp. R.R. at 1. Our caselaw contemplates four types of compensable claims including: (1) physical-physical injuries, where a physical stimulus causes a physical injury; (2) psychic-physical injuries, where a psychic stimulus causes a physical injury; (3) physical-psychic injuries, where a physical stimulus causes a psychic injury; and (4) psychic-psychic injuries, where a psychic stimulus causes a psychic injury. The case at bar concerns a psychic-psychic injury. As we will discuss infra, in Martin v. Ketchum, Inc., we held that a claimant seeking benefits for psychic injuries caused by a psychic stimulus (psychic-psychic) must prove that: (1) he suffered from a psychic injury and (2) the psychic injury was other than a subjective reaction to normal working conditions, i.e., that his working conditions were abnormal. 523 Pa. 509, 568 A.2d 159, 164 (1990); see Davis v. WCAB (Swarthmore Borough), 561 Pa. 462, 751 A.2d 168, 177 (2000). Both parties concede that the Martin standard is appropriate here.

Record at 1 (hereinafter Supp. R.R.). Employer subsequently filed an Answer to Claimant's petition, asserting that Claimant was not entitled to benefits because his psychological injuries pre-dated his employment with Employer.

During hearings before a WCJ, Claimant testified that he had served in the United States Army between 1964 and 1967. He was stationed in Germany until 1966, when he was sent to Vietnam. In Vietnam, he was subjected to at least one sniper attack and observed several violent incidents, such as soldiers and children dying in front of him. Supp. R.R. at 86–87b, 315–16b. Claimant also explained that he witnessed frequent homosexual activity amongst his fellow soldiers in both Germany and Vietnam and that he was horrified by what he saw. *Id.* at 88–96b. Moreover, Claimant relayed that his commanding officer in Vietnam had asked him to engage in homosexual activity in exchange for "amenities." *Id.* at 94b. This event so disturbed Claimant that he attempted to shoot his commanding officer, but stopped when his commanding officer placed his own gun to Claimant's head. *Id.*

When Claimant returned from Vietnam in 1967, he experienced flashbacks from his experiences there. In 1975, he started working for the Buckley Coal Mine and, in 1978, began employment in Employer's mine. Claimant worked for Employer without significant problems until July 1994. According to Claimant, he became disabled at that time as a result of three incidents involving Employer's mine foreman, Dominic Rossi.[4] The first incident occurred on July 6, 1994, when Claimant was working in the mine. According to Claimant, after he refused Mr. Rossi's request to get into a jeep with

---

4. Claimant also testified about an initial incident that occurred in the summer of 1992, which provided background to the ensuing sexually-charged atmosphere that he experienced. Supp. R.R. at 102a. According to Claimant, while he was working in the mine and carrying an armful of tools, Mr. Rossi fondled him, penetrating his anal cavity with a finger. *Id.* However, the WCJ did not make any findings of fact regarding that incident and Claimant's claim petition did not allege that his injuries were caused by that incident. Thereafter, from 1993 to July 5, 1994, Claimant was on disability for a crushed ankle injury incurred in the course of employment. *Id.* at 127a, 186a–87a. It was only one day after he returned to work in the mine, on July 6, 1994, that Mr. Rossi's sexually charged comments began. *Id.* at 128a, 135a, 187a.

him and another co-worker, Allen Vozel, Mr. Rossi told him "you have a nice butt, a real nice looking butt, come on up here and sit down next to me." *Id.* at 133b. Claimant testified that he told Mr. Rossi to stop making such comments, but Mr. Rossi continued until Claimant finally walked away. At that point, Claimant was "shaking inside" and had "a great desire to go over there and take [Mr. Rossi] out." *Id.* at 134b.

Mr. Vozel also testified regarding the above incident and asserted that during his twenty years as a miner he had never heard comments like those made by Mr. Rossi to Claimant and although the employees often joked around with one another, they would generally stop when asked. *Id.* at 207–09b, 211b.

The second incident with Mr. Rossi occurred on July 8, two days later. According to Claimant, he got in a jeep with Mr. Rossi and Joe Ross to get a battery for his mining light. During the drive, Mr. Rossi made comments to Claimant implying that he wanted to have anal sex with him. Claimant asked Mr. Rossi to stop and said, "a statement like . . . this could be a two-headed sword for you, [Rossi], and it's going to be a lot of blood on you and it's not going to be me." *Id.* at 136b. Mr. Rossi replied by stating "well, you like it rough and bloody, and I like it rough and bloody, too. Come on, sit over here next to me. You sure got a nice pair of legs and a nice butt." *Id.* As a result of these comments, Claimant testified that he felt "a great deal of shame and humiliation" as well as extraordinary pain. *Id.* at 137b, 138–39b. Furthermore, he experienced flashbacks to the incident in Vietnam when he was propositioned by his commanding officer. *Id.* at 137–38b ("I kept looking at him, and I would see the [commanding officer], and I would see Rossi. Sort of like the Commanding Officer Rossi, Rossi the Commanding Officer. It was getting confusing as to who I was seeing. And all along he was talking, and I can hear him talk. And inside of myself, I started closing up . . . .").

At trial, Mr. Ross confirmed the details of the incident alleged by Claimant. *Id.* at 67b–68b. According to Mr. Ross, Claimant did not respond to Mr. Rossi's comments and even-

tually exited the jeep. At that point, Mr. Ross questioned Mr. Rossi concerning his sexual orientation and Mr. Rossi responded that he was not homosexual and had only been joking with Claimant. *Id.* at 69b. Mr. Ross additionally testified that he has never heard workers in the mines talk in the way that Mr. Rossi had talked to Claimant, although he admitted to hearing comments such as "blow me." *Id.* at 69b, 73b, 78b.

The last incident with Mr. Rossi occurred on July 13, 1994. Claimant testified that he went to Mr. Rossi's office early in the morning to determine his work assignment. Mr. Rossi was speaking with Terry Rafferty and told Claimant to come into his office. Mr. Rossi then said to Mr. Rafferty, "Boy, doesn't [Claimant] have a nice pair of legs." *Id.* at 144b. Claimant told Mr. Rossi to "stop it" and Mr. Rossi responded by insinuating that Claimant was a male prostitute, stating "Oh, I know what it is, how about would $5 do, would $5 do." *Id.* According to Claimant, following this incident, he wanted to kill Mr. Rossi and had more flashbacks of his experiences in Vietnam. *Id.* at 146–47b. Moreover, although he worked on July 13 and 14, he did not return to work thereafter because he was "falling apart" and having flashbacks "all over the place." *Id.* at 147–48b. Claimant further testified that no one in the mines had ever spoken to him in the way that Mr. Rossi had during the above three incidents. *Id.* at 99–100b, 192–93b.

With regard to this third incident, Employer presented testimony from Mr. Rafferty who confirmed that Mr. Rossi had stated that Claimant had nice legs and that Claimant had told Mr. Rossi to stop it. However, Mr. Rafferty also testified that Mr. Rossi said nothing further after Claimant told him to stop. Mr. Rafferty additionally testified that off-color comments regarding anal sex were often made in the mines. For example, if an employee were lying on the ground, another employee might jump on him "like he's screwing him and that kind of stuff." *Id.* at 267b. Moreover, according to Mr. Rafferty, this type of behavior happened "all the time" and occurred between union employees and management. *Id.*

Mr. Rossi also testified on behalf of Employer. During his testimony, Mr. Rossi conceded that he had said "[s]omething like great butt" to Claimant on July 6, 1994. *Id.* at 329b. Mr. Rossi further acknowledged that two days after the above incident, he saw Claimant again and told him "he ought to be butt-[f———]" for standing in the dark without his helmet light on. *Id.* at 335b. According to Mr. Rossi, nothing else was said after he made the above comments and Claimant did not appear to be angered by them. With regard to the third incident on July 13, Mr. Rossi stated that Claimant did come by his office that morning while he was talking with Mr. Rafferty, but that he said nothing to Claimant at that time.

While Mr. Rossi denied or downplayed the three incidents complained of by Claimant, he confirmed that Employer had disciplined him for his comments to Claimant and that his comments violated the United Mine Workers contract, which prohibits sexual harassment. *Id.* at 342b, 346b. In an affidavit that he completed several months after the above incidents, Mr. Rossi affirmed that he had spoken to Claimant on July 6 and 8 in ways that he "normally would not have." Specifically, Mr. Rossi admitted he was not merely "kidding" with Claimant when he made the comments on July 8, but rather was fueled by anger at Claimant after Claimant carelessly ignored mining safety regulations by failing to utilize a properly-working miner's light. *Id.* at 349b.

In addition to the above testimony, the parties presented expert medical evidence regarding Claimant's injuries and their causes. Claimant presented testimony from two of his treating physicians, each of whom opined with reasonable degrees of medical certainty that Claimant developed PTSD following his experiences in Vietnam, and that Mr. Rossi's comments between July 6 and July 13, 1994 aggravated this condition, causing Claimant to become disabled. *See id.* at 628–30b (testimony of Herbert Thomas, M.D.); *id.* at 725–26b, 761–62b (testimony of Greenbrier Almond, M.D.). A court-appointed doctor also testified that Mr. Rossi's comments were a substantial contributing factor to Claimant's PTSD because they aggravated the condition, which until then had

been under control. *See id.* at 1100b, 1212b–13b, 1236b (testimony of Chester M. Berschling, M.D.); *see also* Letter from Dr. Berschling to WCJ Bloom, 3/24/1999, at 5 ("It is my professional opinion that [Claimant's] experiences in the mines in July 1994 greatly aggravated his underlying [PTSD]"). In contrast to the above testimony, Employer's medical expert testified that Claimant suffered from paranoid personality disorder, not PTSD. *See id.* at 501–02b, 512b, 889–90b (testimony of Lawson Bernstein, M.D.). He further opined that Mr. Rossi's comments neither caused nor aggravated Claimant's psychological problems. *See id.* at 890b, 918–19b.

The WCJ made several findings of fact regarding the above-described events and the medical testimony. While not expressly stating which evidence he found credible, the WCJ concluded that Mr. Rossi made the statements attributed to him by Claimant, Mr. Ross, Mr. Vozel, and even Mr. Rossi, to the extent that he admitted making several of the comments in question. The WCJ also documented in its findings of fact the testimony of Mr. Vozel and Mr. Ross that Mr. Rossi's comments were not normal occurrences in the mine, while still acknowledging Mr. Vozel's testimony that a lesser level of jovial antics was common in the mines. Additionally, the WCJ credited the expert medical testimony of Claimant's physicians who stated that Claimant's PTSD was aggravated by the work environment in the mine, specifically by the behavior of Mr. Rossi. WCJ Slip Op. at 7.

Based on these findings of fact, the WCJ concluded as a matter of law that Mr. Rossi's comments to Claimant constituted of abnormal working conditions.[5] WCJ Slip Op. at 10. Apparently deeming credible the testimony favoring Claimant, the WCJ emphasized that the incidents in question were not

---

5. The WCJ further determined that Mr. Rossi's comments could not be considered normal because they violated federal law, namely, the Civil Rights Act of 1964, 42 U.S.C. § 2000E–2.a.1. WCJ Slip Op. at 7 (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)) (holding that the Civil Rights Act of 1964 is violated when the workplace is permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment).

normal joking or merely uncivil behavior but rather constituted a "course of conduct" that was "clearly calculated to cause severe emotional distress" to Claimant. *Id.* Thus, the WCJ held that Claimant was entitled to benefits because he had established that he was disabled as a result of abnormal working conditions, as required by *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159, 164 (1990).

The Board subsequently affirmed, finding sufficient evidence to support the WCJ's conclusion that Mr. Rossi's comments created abnormal working conditions. The Board pointed out that several of Claimant's co-workers had testified that "the sexually explicit homosexual comments made by Mr. Rossi to Claimant went beyond those accepted in the mines and were previously unheard of." WCAB's Op., at 6. The Board further held that Mr. Rossi's comments were clearly unacceptable because Employer had disciplined Mr. Rossi for making them. *Id.* Based on the WCJ's findings of fact, the Board agreed with the WCJ that Claimant had established the existence of abnormal working conditions and that such conditions aggravated his PTSD. *Id.* at 12.

Employer appealed to the Commonwealth Court, which reversed the Board's order. *See RAG (Cyprus) Emerald Resources, LP v. WCAB (Hopton)*, 850 A.2d 833 (Pa.Cmwlth. 2004).[6] The Commonwealth Court determined that the "evidence fails to support a finding of abnormal working conditions in the present controversy." *Id.* at 839. As support for

---

6. The Commonwealth Court referred to the determination of whether working conditions are abnormal as a mixed question of fact and law. *Hopton*, 850 A.2d at 837. While we repeatedly have held that the ultimate determination of whether the employee established "abnormal working conditions" is a question of law fully reviewable on appeal, we have also acknowledged that "psychic injury cases are highly fact-sensitive and for actual working conditions to be considered abnormal, they must be considered in the context of specific employment." *Wilson v. WCAB (Aluminum Co. of Am.)*, 542 Pa. 614, 669 A.2d 338, 343 (1996), *see also Davis*, 751 A.2d at 174. Such a fact-sensitive inquiry requires deference to the fact-finding functions of the WCJ and, accordingly, we limit our review of those factual findings to determining whether they are supported by the evidence and overturn them only if they are arbitrary and capricious. *Id.* Thus, as discussed *infra*, we view the appellate review of this question as a two-step process of reviewing the factual findings and then the legal conclusion.

this legal conclusion, the Commonwealth Court first stated that "Claimant had an injured psyche and was predisposed to mental problems." *Id.* at 839.

Second, the Commonwealth Court determined that Mr. Rossi's comments did not create abnormal working conditions because the evidence revealed that those comments, while "crude and unacceptable," were nevertheless "normal" in the "rough and tumble" mining industry, disregarding the WCJ's numerous findings of fact based on the testimony that these statements were unusual in the mine. The Commonwealth Court quoted a brief segment of testimony wherein Mr. Ross responded to the WCJ's inquiry into the regularity of such language:

> JUDGE BLOOM: My point is . . . you joke, you kid around and say, blow me, [sic] asshole and it's accepted. What's the difference between those terms and what Mr. Rossi said to Hoppy [Claimant]? Is there any difference?
>
> A. [Mr. Ross]: I guess not.

*Id.* at 839, n. 11. The Commonwealth Court additionally noted that Claimant, at one point in the mines, jokingly told his co-workers that he dated a transvestite. *Id.*

Finally, the Commonwealth Court additionally concluded that Mr. Rossi's comments were not frequent enough to constitute abnormal working conditions because they occurred only three times "over an eight-day period during Claimant's sixteen-year mining career with Employer." *Id.* Based on these three findings, the Commonwealth Court determined that Claimant failed to establish the requisite abnormal working condition and, accordingly, was not entitled to benefits.

Judge Friedman filed a dissenting opinion, joined by Judge Leavitt, stating that the "majority's holding is contrary to case law and . . . ignores the credibility determinations and findings of fact made by the [WCJ]." *Id.* at 840 (Friedman, J., dissenting). Judge Friedman opined that the majority improperly based its conclusion that Claimant's injury did not result from abnormal working conditions on the fact that he had a pre-existing mental condition. Judge Friedman assert-

ed that Claimant's pre-existing mental condition should not bar his right to receive benefits, emphasizing that this Court has never held that a pre-existing condition or a predisposition to mental illness is a factor in the *Martin* analysis. *Id.* at 843 (citing *City of Pittsburgh v. Logan*, 570 Pa. 500, 810 A.2d 1185, (2002)). Indeed, Judge Friedman noted, the Commonwealth Court has repeatedly approved of benefit awards to claimants who have established that abnormal working conditions aggravated pre-existing mental injuries. *Id.* (citing *Zink v. WCAB (Graphic Packaging, Inc.)*, 828 A.2d 456 (Pa.Cmwlth.2003) (*en banc* ), *appeal denied*, 580 Pa. 702, 860 A.2d 126 (2004), *Kane v. WCAB (Williamsport Automotive)*, 107 Pa.Cmwlth. 360, 528 A.2d 302 (1987), *Hirschberg v. WCAB (Dep't of Transp.)*, 81 Pa.Cmwlth. 579, 474 A.2d 82 (1984)).[7] Judge Friedman also disagreed with the majority's conclusion that the evidence did not support the conclusion that Mr. Rossi's comments created abnormal working conditions. According to Judge Friedman, the majority exceeded its standard of review by overruling the WCJ's finding of fact that Mr. Rossi's comments were unusual as there was substantial evidence in the record to support that finding. Finally, Judge Friedman disagreed with the majority's finding that Mr. Rossi's comments were not frequent enough to constitute abnormal working conditions, explaining that "[a]lthough a single isolated incident of offensive behavior does not constitute an abnormal working condition, *repetitive* harassment by a superior over a period of time *does* constitute an abnormal working condition." *Id.* at 844 (emphasis in original).

Claimant subsequently filed a petition for allowance of appeal with this Court, and we granted review to consider

7. Judge Leavitt authored a separate dissenting opinion, which Judge Friedman joined. According to Judge Leavitt, the majority's decision conflicted with the Commonwealth Court's decision in *Zink. See Hopton*, 850 A.2d at 846 (Leavitt, J., dissenting). In response, the majority opinion differentiated the facts in Zink, which involved an employer with notice of the employee's pre-existing injury, from the case at bar, in which Employer did not have notice of Claimant's pre-existing condition. *Id.* at 840. We need not consider the relevance of employer's notice, as we conclude, *infra*, that employers must take their employees as they come. *See Pawlosky v. WCAB (Latrobe Brewing Co.)*, 514 Pa. 450, 525 A.2d 1204, 1209 (1987).

whether the Commonwealth Court erred in concluding that Claimant was not entitled to benefits. Claimant asserts that the Commonwealth Court abused its discretion in usurping the function of the fact-finder by reweighing the evidence presented before the WCJ and in failing to follow its own precedent in *Zink*, wherein the Commonwealth Court recognized the aggravation of a pre-existing mental condition to be a cognizable claim under the Act.

In response, Employer asserts that it was within the Commonwealth Court's purview to consider the record independently and make its own determinations of abnormal working conditions. Moreover, Employer maintains that the Commonwealth Court correctly determined that Claimant's aggravation was a non-compensable, subjective reaction of a fragile individual to normal working conditions. Contrary to Claimant's allegations, Employer asserts that the present situation is factually distinguishable from *Zink* because here, unlike in *Zink*, Employer had no notice of Claimant's pre-existing condition.

 "In workers' compensation appeals, this Court must affirm the adjudication below unless we find that an error of law was committed, that constitutional rights were violated, that a practice or procedure of a Commonwealth agency was not followed or that any necessary finding of fact is not supported by substantial evidence of record." *Daniels v. WCAB (Tristate Transp.)*, 574 Pa. 61, 828 A.2d 1043, 1046 (2003); *see* 2 Pa.C.S. § 704. Under *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159, 164 (1990), a claimant will be entitled to compensation for a psychic-psychic injury if he can demonstrate that the injury resulted from abnormal working conditions, not merely the result of a subjective reaction to normal working conditions. As previously discussed *supra* note 5, we have recognized that the *Martin* analysis requires a fact-sensitive inquiry into the specific employment situation, requiring our deference to the factual findings of the WCJ, or on certain occasions the factual findings of the WCAB, who have the benefit of observing the witnesses. *See Davis*, 561 Pa. at 479, 751 A.2d at 168. Accordingly, we will overturn the

factual findings only if they are unsupported, arbitrary, or capricious. *Id.* at 473, 751 A.2d 168. Conversely, the determination of whether those factual findings establish abnormal working conditions under *Martin* is a question of law, fully reviewable on appeal. *Id.* Consequently, our review of the present case requires, pursuant to this standard, a two-prong examination. First, we must decide whether the Commonwealth Court abused its discretion by substituting its factual findings for those made by the WCJ and supported by the record, and second, whether the findings of fact support the legal conclusion that Claimant's injury was the result of an abnormal working condition.

■ Turning to the first step in the review, we conclude that the Commonwealth Court abused its discretion by not limiting its review to determining whether the WCJ's factual findings were supported by the record and, instead, focusing on a brief section of testimony not included in the WCJ's factual findings to support its own conclusion that Rossi's comments were "normal in the mining industry." *Id.* at 839. The court failed even to mention the relevant factual findings of the WCJ detailing the testimony of Claimant's co-workers distinguishing Rossi's comments from the "normal" conditions of the mine:

9. Alan Vozel testified that there is some joking and horseplay in the mines but that when someone would ask that it be stopped, it would be stopped. The exception in [sic] the incidents between Rossi and the claimant when Rossi refused to stop and continued to the aggravation of the claimant. Joe Ross testified that he had *never heard anyone being spoken to as Rossi had done to the claimant* and that references to anal sexual relations were uncommon. He testified that *the comments from Rossi to the claimant were beyond the normal scope of joking at the mines.*

10. Joe Plachta, co-worker of the claimant, testified that *the types of comments that the claimant was subject to from Rossi were uncommon* and that Plachta had never been talked to in this fashion. He also testified that the comments

made by Rossi were *beyond the scope of the normal every-day horseplay.*

WCJ Slip Op. at 7 (emphasis added). As described in the factual recitation of this opinion, *supra* at pages 3–5, these findings are supported by the notes of testimony of the relevant mine workers, and are neither arbitrary nor capricious.[8] *See Davis,* 561 Pa. at 473, 751 A.2d 168. While at least one co-worker testified that comments of this type were common, the WCJ, who had the benefit of viewing the witnesses, was within his discretion to rely upon the testimony of the several who testified that Rossi's comments went beyond the normal joking and horseplay present in the mine, rather than the one, who disagreed. Accordingly, we conclude that the Commonwealth Court failed to review properly the factual findings of the trial court.

■ Given that the Commonwealth Court's decision was based on a misapprehension of the relevant facts, we need not consider its application of those facts to the legal question before us. Instead, we independently consider whether the facts as found by the WCJ establish Claimant's right to compensation pursuant to *Martin v. Ketchum,* 523 Pa. 509, 568 A.2d 159 (1990). Accordingly, we must determine whether the aggravation of Claimant's PTSD resulted from "abnormal working conditions." *Id.*

A brief review of the development of our case law regarding compensable psychic injuries provides a necessary backdrop to our consideration of this question. In 1972, the General Assembly altered the definition of the term "injury" from one requiring "violence to the physical structure of the body" to "an injury to an employee, regardless of his previous physical condition, arising in the course of his employment and related thereto." 77 P.S. § 411. As a result of this amendment, this

8. Although we did not set forth the testimony of Joe Plachta in our factual recitation, the WCJ's findings regarding his testimony are supported by the record. *See* Supp. R.R. at 219b Mr. Plachta (stating that he believed that Mr. Rossi's comments were "very uncommon" based on his experiences in the mines since 1978), 220b Mr. Plachta (testifying that he did not know of any incidents "of management ever talking to [an employee] like that before").

Court held that mental illness, which prior to the 1972 Amendment was not cognizable under the Act, could be a compensable injury. *Martin*, 523 Pa. 509, 568 A.2d 159.[9]

This Court, however recognized the inherent difficulty in establishing causation in psychic injury cases, because such maladies are intrinsically subjective. Consequently, we recognized the need to "distinguish psychiatric injuries that are compensable because the necessary causal relationship between the employment and mental disability has been established from those psychiatric injuries that arise from the employee's subjective reactions to normal working conditions." *Id.* at 164. Thus, in contrast to physical injuries, which merely require that the injury arise in the course of employment, we held that a claimant seeking benefits for a psychic injury must meet a higher standard for causation by proving that (1) he suffered a psychic injury and (2) his psychic injury was more than a subjective reaction to normal working conditions, *i.e.*, his working conditions were "abnormal." *See Panyko*, 888 A.2d at 730, *Martin*, 568 A.2d at 165.

In classifying working conditions as normal or abnormal, we do not employ a bright line test or a generalized standard, but instead, consider the specific work environment of the claimant; for we recognize that what may be normal for a police officer will not be normal for an office worker. *See Wilson*, 669 A.2d at 343. Consequently, we deny compensation for injuries resulting from events that are expected in the relevant working environment, whether it is an office worker's change in job title or responsibility, *see id.* at 344, or a police officer's involvement in life-threatening situations, *see Davis*, 561 Pa. 462, 751 A.2d 168. Additionally, we do not expect employers to provide emotionally sanitized working conditions. "In assessing whether work conditions are abnormal, we must recognize that the work environment is a microcosm of society. It is not a shelter from rude behavior, obscene language,

9. For a general discussion of the evolution of the term "injury" for the purpose of the Act, *see Panyko v. WCAB (U.S.Airways)*, 585 Pa. 310, 888 A.2d 724 (2005).

incivility, or stress." *Philadelphia Newspapers, Inc. v. W.C.A.B. (Guaracino),* 544 Pa. 203, 675 A.2d 1213, 1219 (1996).

In the case at bar, the WCJ followed our dictates and considered what was normal for the mine. After painstakingly detailing the testimony of long-time miners distinguishing Rossi's comments from the normal horseplay occurring in the mine, the WCJ concluded that the statements were "more than mere uncivil, crude, joking behavior," but were evidence of "a course of conduct on the part of a supervisory employee clearly calculated to cause severe emotional distress." WCJ Slip Op. at 10. We agree.

This case involves a series of sexually harassing comments by a supervisor that, as Rossi acknowledged, violated the United Mine Worker's contract, resulting in disciplinary action by the employer, and arguably constitutes criminal harassment. We thus agree with the WCJ's legal conclusion that Claimant established that Rossi's comments constituted abnormal working conditions. Accordingly, because the WCJ credited the medical testimony establishing a causal link between the statements and the aggravation of Claimant pre-existing PTSD, we conclude that Claimant has established a compensable injury.

In so concluding, we necessarily reject two of the Commonwealth Court's bases for denying compensation. First, the Commonwealth Court stated, "the medical evidence established Claimant had an injured psyche and was predisposed to mental problems." *Hopton,* 850 A.2d at 839. The Commonwealth Court failed to provide any reason for treating claimants with pre-existing mental injuries differently from claimants with pre-existing physical injuries. While we apply an elevated standard of proof relating to the causal element of workers' compensation benefits in psychic injury cases, we have never barred otherwise deserving claimants from recovery due solely to their pre-existing condition. Under our caselaw, in worker's compensation, as in tort law, "an employer [takes] an employee as he comes." *Pawlosky v. WCAB,* 514 Pa. 450, 525 A.2d 1204 (1987) (holding that job-related

aggravation of a pre-existing disease may be an injury under the Act, even if the disease is not an occupational disease). A claimant with a pre-existing injury, whether mental or physical, is entitled to benefits so long as he shows that his injury has been aggravated, reactivated, or accelerated by a working condition to the point of disability. *Id.* at 1209. If a claimant is able to satisfy the test set forth in *Martin,* the pre-existing nature of the injury does not disqualify him from receipt of compensation. Thus, to the extent that the Commonwealth Court relied on the pre-existing nature of Claimant's mental injury to justify reversing the lower tribunals' decisions, it erred.

Moreover, we reject the Commonwealth Court's reliance on this Court's decision in *Philadelphia Newspapers, Inc. v. WCAB (Guaracino),* 544 Pa. 203, 675 A.2d 1213, 1218 (1996), to support its conclusion that Mr. Rossi's comments were too infrequent to constitute abnormal working conditions. *Hopton,* 850 A.2d at 839. *Guaracino* involved a newspaper delivery driver who suffered psychological distress following a single incident of criticism by his supervisor, who used vulgar language and arguably menacing behaviors in reprimanding the employee for losing a bundle of newspapers. While the language and the situation were undeniably unpleasant, there was no testimony that the supervisor's behavior deviated from normal disciplinary conduct in that employment context. *Id.* at 1218. In contrast, this case involves a series of similar comments, which testimony demonstrated to be unusual in the mine that did not show any sign of ending or decreasing in intensity or frequency.[10]

10. Additionally, we stress that our holding in *Guaracino* does not suggest that there is a talismanic quality to the number of psychological abuses that, when exceeded, will turn a normal working condition abnormal. Instead, our holding in *Guaracino,* as in our other cases in this area, demonstrates the need for courts to look at the totality of the circumstances. As we can envision a single incident that could constitute an abnormal working condition, if sufficiently severe and unusual in the context of the relevant working environment, so too can we envision that relatively minor conduct could result in a determination of abnormal working conditions if that conduct is imposed repeatedly and is demonstrably unusual in that environment. Thus, we conclude that, to the extent the Commonwealth Court based its holding on the

While any one of Rossi's comments may or may not have been enough to create an abnormal working environment in isolation, the WCJ was within his discretion factually, and correct in application of the facts to the legal construct, when he determined that Rossi's comments "demonstrate a course of conduct by a supervisory employee clearly calculated to cause severe emotional distress." WCJ Slip Op. at 10.

Accordingly, we reverse the Commonwealth Court's order, which reversed the WCJ's award of benefits to Claimant, and remand for reinstatement of the WCJ's order.

Chief Justice CAPPY, and Justices CASTILLE, SAYLOR and EAKIN join the opinion.

Former Justices NIGRO and NEWMAN did not participate in the decision of this case.

number of comments, without engaging in a totality of the circumstances analysis, it erred.