**FROG, SWITCH & MANUFACTUR-ING COMPANY, Petitioner,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (JOHN-SON), Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 8, 2014.

Decided Dec. 4, 2014.

Stephen M. Greecher, Jr., Lemoyne, for petitioner.

Daniel W. Stern, Harrisburg, for respondent.

BEFORE: DAN PELLEGRINI, President Judge, and BERNARD L. McGINLEY, Judge, and BONNIE BRIGANCE LEADBETTER, Judge, and RENÉE COHN JUBELIRER, Judge, and P. KEVIN BROBSON, Judge, and PATRICIA A. McCULLOUGH, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge COVEY.

Frog, Switch & Manufacturing Company (Employer) petitions this Court for review of the Workers' Compensation (WC) Appeal Board's (Board) January 2, 2014 order affirming the Workers' Compensation Judge's (WCJ) decision granting Lindora Johnson's (Claimant) Claim Petition. Employer presents two issues for this Court's review: (1) whether the WCJ's findings of fact are supported by substantial evidence, and (2) whether the WCJ applied the proper standard to Claimant's work injury in determining whether Claimant met her burden of proof.

Claimant began working as a "rover" for Employer, a fabricator of steel products, on October 30, 1989. Claimant's job required her to operate overhead cranes in areas where metal is molded. Claimant is one of two females and the only African–American female in a workforce of approximately 200 employees. Claimant testified at the WCJ hearing regarding three separate workplace incidents that occurred in May 2009, which she reported in a complaint she filed with the Pennsylvania Human Relations Commission (PHRC). The first occurrence concerned a new employee, not knowing Claimant's identity, who told Claimant: "I was told don't work underneath that Penny [Claimant]." Reproduced Record (R.R.) at 60a. The co-worker she was with said that "he's going by, you know, other people who are always saying this about you and this and that[.]" [1] *Id.* The second episode involved employee Ken Hurley who told Claimant: "I don't think women should be working here[,]" in front of Employer's CEO Warren Beiger (Beiger) and its safety director Dan Gibbs. R.R. at 61a. Lastly, Claimant

---

1. Apparently, there was an incident involving Claimant's actions being unsafe because Claimant testified that it "dated from way back, maybe ten years ago, with a situation, which I was—which the record should have been—it was rescinded and why it keeps coming up, I have no idea." R.R. at 61a–62a.

explained that she was taken off an assignment to work a 30 ton crane because another employee, Jeff Feuchenberger (Feuchenberger), refused to work under her. Claimant also stated that she was denied overtime, but Claimant's union officials justified the matter under the collective bargaining agreement's seniority and job description rules.

Claimant also testified regarding another allegation in her PHRC complaint that occurred in the workplace on or about August 30, 2009. Claimant reported that during a discussion with supervisor Mike Zimmerman (Zimmerman) about what they were going to do on their days off, Zimmerman said: "I could tell you right now, my wife is not gonna treat me like a—the N word." R.R. at 68a. Claimant asked Zimmerman if he knew what he said, and he repeated it. After further discussion, Zimmerman told Claimant "I'll talk to you later[,]" and walked away. *Id.* Claimant turned to the union unit chair Walter Hockley (Hockley) who was standing in their presence, and said "I can't believe he said that. Does he know what that means on me?" *Id.* Hockley responded "you've got to stop worrying about everybody else. You got to worry about yourself." *Id.* As a result of this occurrence, a meeting was held in September 2009 with foundry superintendent Steve Vick (Vick), Claimant and Zimmerman. At that meeting, Vick read what he represented to be the dictionary "definition of the 'N' word." R.R. at 69a. Zimmerman apologized to Claimant.

Claimant further testified regarding another allegation in her PHRC complaint which took place in mid-September. Claimant reported that upon exiting the women's locker room she noticed a noose hanging in an office Zimmerman shared with foreman Mike Smith (Smith). Claimant complained to Smith and requested that it be taken down. Claimant was in a position to observe the noose because the office door was wide open. Employer's witness admitted that the noose was seen by more than 100 people in the plant, and that it was up and visible for 2 to 3 days before it was taken down.

Zimmerman testified that on the night of this occurrence he had a terrible night and went back to his office and told Smith that if one more thing goes wrong he was going to hang himself. Thereafter, he received a call regarding another issue he had to address. When he returned, Smith had the noose hanging and waiting for him. Zimmerman testified that "it was just a joke between [Smith] and [Zimmerman] because that's the way [they] carried on back and forth. It was something to break the tension of the foundry life between [Smith] and [Zimmerman]." R.R. at 378a–379a.

On September 23, 2009, a meeting was held to discuss Feuchenberger's refusal to work with Claimant. Feuchenberger reported that Claimant's actions were unsafe and she refused to listen to signals. Claimant left the meeting crying stating that nothing had changed, people were out to get her and she was going to file a grievance. *See* R.R. at 256a. On September 30, 2009, Claimant filed an accident report in response to which Employer referred Claimant to its doctor for emotional distress. September 30, 2009 was Claimant's last day of work until she returned to work on April 19, 2010.

On May 10, 2010, Claimant filed a Claim Petition in which she alleged that she sustained a work injury in the nature of atypical depression related to abnormal working conditions, and asserted September 29, 2009 as the date of injury. Claimant sought temporary total disability benefits for the time period beginning September 30, 2009 and ending April 19, 2010, togeth-

er with payment of medical bills and attorney's fees.

■ Hearings were held on August 13, 2010, December 9, 2010 and January 28, 2011. On August 4, 2011, the WCJ granted Claimant's Claim Petition. Employer appealed to the Board. On January 2, 2014, the Board affirmed the WCJ's decision. Employer appealed to this Court.[2]

■ Employer first argues that the WCJ's Findings of Fact 14, 38, 39 and 40 are not supported by substantial evidence.[3] 'Substantial evidence is such relevant evidence a reasonable person might find sufficient to support the WCJ's findings.' *Rosenberg v. Workers' [Comp.] Appeal [Bd.] (Pike County)*, 942 A.2d 245, 249 n. 4 (Pa.Cmwlth.2008). In determining whether a finding of fact is supported by substantial evidence, this Court must consider the evidence as a whole, view the evidence in a light most favorable to the party who prevailed before the WCJ, and draw all reasonable inferences which are deducible from the evidence in favor of the prevailing party.

*O'Rourke v. Workers' Comp. Appeal Bd. (Gartland)*, 83 A.3d 1125, 1132 n. 6 (Pa. Cmwlth.2014).

■ Finding of Fact 14 states:

**Following the meeting about the noose, Claimant,** not ordinarily an emotional person by her own account or by the descriptions of her from [Employer's] witnesses, **began to cry uncont-**

rollably. She went to [Vick] and before that had gone to the CEO, [Beiger] in an attempt to resolve the inappropriate comments described herein.

WCJ Dec. at 2, FOF 14 (emphasis added). However, when asked when the crying incident occurred, Claimant testified:

It was in the latter part of September. I think it was the day with Feuchenberger, I think with ... Feuchenberger. And prior to that, I guess,—I'm probably mumble jumble with ya'll, but prior to that, I had went to our CEO, [Beiger].

I went to ... Vick, trying to get some resolution to whatever this problem is they have with me, and I think **it was— it was with ... Feuchenberger, I think that's when I finally—I just lost control.**

R.R. at 72 (emphasis added). According to the incident report, the meeting with Feuchenberger was completely unrelated to the noose occurrence. Specifically, the incident report provided that "[Feuchenberger] said [Claimant] was unsafe in cranes and wouldn't work under her." R.R. at 256a. The report further recited: "After the meeting[, Claimant] was upset to the point of crying...." *Id.* The record evidence does not support the WCJ's finding of fact that Claimant was crying uncontrollably after the meeting about the noose.[4]

■ Finding of Fact 38 states:

---

**2.** "Our review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated." *Dep't of Transp. v. Workers' Comp. Appeal Bd. (Clippinger)*, 38 A.3d 1037, 1042 n. 3 (Pa.Cmwlth. 2011).

**3.** Thus, the "salient issue" is not "whether ... an abnormal working environment ... caused Claimant's psychological injury[,]" as

stated by the Dissent, but rather whether substantial record evidence supported the specified challenged findings of fact. Dissent at 210.

**4.** The Dissent maintains that the timing of Claimant's crying bout is a "picayune distinction" that the Majority uses "as the basis to reverse[,]" and "is not in accord with the appropriate standard of review." Dissent at 210. Determining "whether the **necessary** findings of fact are supported by substantial

The **testimony** of Howard Dissinger [ (Dissinger) ] is found to be competent, credible and persuasive. His **testimony** is supported by the credible facts of the case, as well as the medical records. Moreover, his treatment of Claimant, in conjunction with Claimant's physician, enabled Claimant to return to work on April 19, 2010.

WCJ Dec. at 6, FOF 38 (emphasis added). However, Dissinger, Claimant's treating psychologist, did not testify. Rather, his January 26, 2010 letter and progress notes were admitted at the WCJ hearing as Exhibit C–5. Further, Dissinger's letter and progress notes do not reference either the use of the "N" word or the noose, but rather state that the cause of Claimant's "[a]typical [d]epression" is "her stressful and overwhelming work conditions." R.R. at 410a. Moreover, the only other medical records Claimant presented were the medical note authored by David L. Wampler, M.D. (Wampler) referencing Claimant's September 30, 2009 examination, which did not include a diagnosis, and the work status report authored by Dr. Bagian (Bagian) which merely states a diagnosis of "STRESS REACT, EMOTIONAL[.]" R.R. at 399a–400a, 464a. Thus, the record evidence does not support the finding that Dissinger's testimony is supported by credible facts and medical records.[5]

■ Finding of Fact 39 states:

The testimony of Dr. [Robert Charles] Cohn[, M.D. (Cohn) ] is rejected to the extent it is contrary to, or inconsistent with, the credible testimony of [Dissinger]. Specifically, this [WCJ] rejects [Cohn's] unexplained assertion that although racial epithets of the type evidenced in this case could be 'stressors[,]' and that Claimant found them to be so, that they are without clinical significance. Indeed, no other, plausible explanation exists to explain why Claimant suffered a period of severe depression after a period of wellness dating back to the year 2009, a fact admitted by [Cohn].

WCJ Dec. at 6, FOF 39. Initially, Cohn's only testimony contrary or inconsistent to Dissinger's letter and progress notes is that Cohn did not find Claimant's working conditions to be the cause of her depression. Indeed, Dissinger never discussed or noted either the "N" word or noose in his letter. In addition, although the WCJ labeled Cohn's testimony as unexplained, the record reflects that when Cohn was specifically asked whether the use of the "N word" and seeing a noose contributed to her "diagnosis of major depressive disorder recurring[,]" Cohn responded: "Well, I don't think it had a contribution to her diagnosis. I think they may have been stressors to her which she reported and which I state. I think they were stressors I don't think they were causative factors in terms of her diagnosis, if that makes sense." R.R. at 304a. Further, when

---

evidence," is indeed the standard of review. *Procito v. Unemployment Comp. Bd. of Review,* 945 A.2d 261 (Pa.Cmwlth.2008) (emphasis added). Moreover, the WCJ used the timing of Claimant's crying to support his conclusion that the noose incident caused Claimant's work injury. As explained above, this conclusion is not supported by the record evidence. Thus, the fact that this finding is unsupported by substantial evidence is highly relevant to the final determination.

5. The Dissent claims "[t]he Majority again focuses on the trivial" by specifying that Dissinger did not testify. Dissent at 210. The Dissent continues that the WCJ recognized this when he referred to Dissinger as "Claimant's testifying (report) expert[.]" *Id.* However, not only did Dissinger not testify, he did not submit a report. Dissinger provided a four sentence letter. Upon review, this four sentence letter clearly is not *substantial* evidence capable of supporting the WCJ's conclusion. *See* R.R. at 410a.

asked whether "those events described were of significance to her[,]" Cohn answered: "Well, I think they may have been of significance to her. But I would also note that in her whole time of counseling and therapy, none of that comes to the forefront, none of that is even brought up in a note, so...." R.R. at 296a. Moreover, the WCJ's statement that "no other plausible explanation exists" is unsupported by the record. WCJ Dec. at 6, FOF 39. In fact, that finding contradicts record evidence that Claimant's condition was a subjective reaction to the normal and expected demands of Employer, and improperly placed the burden of proof on Employer rather than Claimant. Accordingly, this finding of fact is unsupported by substantial evidence.

■■■ Finding of Fact 40 states: "Based upon the competent and credible evidence of record, it is found as a fact that Claimant was subjected to actual **abnormal working conditions**, and sustained a work injury in the nature of atypical depression as a result of these abnormal working conditions." WCJ Dec. at 6, FOF 40 (emphasis added). However, Dissinger's reference to Claimant's stress reaction and atypical depression after experiencing "stressful and overwhelming work conditions" is not substantial evidence that abnormal work-

ing conditions exist, or that Claimant's condition resulted from those working conditions which the WCJ refers to as abnormal. R.R. at 410a. Moreover, Claimant's own witness, Hockley, undermined Claimant's claim when he testified that Claimant was "satisfied with the end result" regarding Zimmerman's reference to himself as the "N-word", and that the noose incident was addressed by management. R.R. at 422a–426a. Further, when asked if the assignment of overtime was "governed by the collective bargaining agreement[,] Hockley replied: "Yes, it is." R.R. at 431a. Therefore, the record is devoid of substantial evidence to support Finding of Fact 40.[6]

Viewing the evidence in a light most favorable to Claimant and drawing all reasonable inferences therefrom, we cannot find in the record before us "such relevant evidence a reasonable person might find sufficient to support the WCJ's [F]indings" of Fact 14, 38, 39 and 40. *O'Rourke*, 83 A.3d at 1132 n. 6.

■■■ Employer next argues that Claimant failed as a matter of law to prove that she sustained a work injury as a result of abnormal work conditions. "In psychic injury cases, the record must contain unequivocal medical testimony to establish the causal connection between the

---

6. The Dissent declares that "the Majority is overruling the WCJ's credibility determinations and ignores that the WCJ based its conclusion ... on the culmination of several specific events[.]" Dissent at 210. The Majority did not overrule the WCJ's credibility determinations and, in fact made no reference to the same. The Majority acknowledges that the incidents occurred, although the coworker who used the N-word was referencing himself, not Claimant, and later apologized, and the noose was a private joke between two other co-workers having nothing to with Claimant. Although the Dissent stated that the WCJ "believed" differently, it cited no support for this alleged belief. Dissent at

212. Notwithstanding, Claimant's credibility is irrelevant because "[w]here there is no obvious causal connection between an injury and the alleged cause, that connection must be established by unequivocal medical testimony." *Lewis v. Commonwealth*, 508 Pa. 360, 498 A.2d 800, 802 (1985). Thus, the Majority in no manner ignored or overruled the WCJ's credibility determinations. Claimant simply did not meet her burden of proving that said incidents caused her injury. Moreover, Claimant had previous psychological conditions including "depression" and a "nervous breakdown," as well as a "family history" involving "mental problems[.]" R.R. at 266a.

injury and employment. Due to the highly subjective nature of mental injuries, **an injury's occurrence and cause must be specifically delineated.**" *Lukens Steel Co. v. Workmen's Comp. Appeal Bd. (Price)*, 149 Pa.Cmwlth. 177, 612 A.2d 638, 642 (1992) (citations omitted; emphasis added). "[A] claimant seeking benefits for a psychic injury **must meet a higher standard for causation** by proving that (1) he suffered a psychic injury and (2) his psychic injury was **more than a subjective reaction to normal working conditions,** *i.e.*, his working conditions were 'abnormal.'" *RAG (Cyprus) Emerald Res., L.P. v. Workers' Comp. Appeal Bd. (Hopton)*, 590 Pa. 413, 912 A.2d 1278, 1288 (2007) (emphasis added).

■ Here, the WCJ's conclusion that Claimant's "work-related psychological injury [was] caused by abnormal working conditions[ ]" was based on Dissinger's "report[,]" Bagian's "diagnos[is,]" and Wampler's "diagnos[is.]"[7] WCJ Dec. at 7, 8. However, **none of the above** "specifically **delineate[ ]" the cause** of Claimant's injury, or proved that Claimant's "injury was more than a subjective reaction to normal working conditions." *RAG*, 912 A.2d at 1288; *Lukens Steel*, 612 A.2d at 642 (emphasis added).

Dissinger's report merely provides that Claimant's atypical depression "was solely caused by her **stressful and overwhelming work conditions.**" R.R. at 410a (emphasis added). Bagian reported a diagnosis of "STRESS REACT, EMOTIONAL" but states no cause therefor. R.R. at 464a. In regard to Wampler, the WCJ wrote in his decision that Wampler diagnosed Claimant with job related stress, "stating she has objective[ ] signs of illness[.]"[8] WCJ Dec. at 7. These documents cannot and do not support the WCJ's conclusion that Claimant's mental injury was caused by the incidents Claimant testified to and the WCJ summarized involving Zimmerman, Smith and Claimant's co-workers. Because Claimant has not met her burden of proving that these conditions caused her mental stress, she is not eligible for WC benefits. Accordingly, this Court need not determine whether said conditions were normal or abnormal working conditions.[9]

For all of the above reasons, the Board's order is reversed.

Judge LEAVITT did not participate in the decision in this matter.

### ÓRDER

AND NOW, this 4th day of December, 2014, the Workers' Compensation Appeal Board's January 2, 2014 order is reversed.

---

**7.** Dissinger did not submit a "report," but rather submitted a four sentence letter. In addition, neither Bagian nor Wampler testified at the WCJ hearings. Bagian merely authored Claimant's "WORK STATUS REPORT" and Wampler was the doctor Employer referred Claimant to on the day she filed her accident report.

**8.** Although the WCJ attributes this statement to Wampler's September 30, 2009 examination, the report from that visit does not include any such quotation. *See* R.R. at 399a–400a. In Finding of Fact 17, the WCJ attributes the same quote to a December 4, 2009 examination; however, the record does not

reflect the statement on that date either. *See* WCJ Dec. at 3, FOF 17.

**9.** The Dissent opines that the Majority concluded "Claimant failed to prove she sustained a work injury as a result of abnormal working conditions." Dissent at 211. However, the Majority did not draw such a conclusion. In fact, the Majority never reached the issue of whether Claimant's working conditions were abnormal because the WCJ's above findings of fact were not supported by substantial evidence and Claimant did not meet her burden of proving that the work conditions caused her injury.

DISSENTING OPINION BY Judge McGINLEY.

I must respectfully dissent.

Although the Majority recites the correct test to determine whether the WCJ's finding of fact are supported by substantial evidence, I do not believe that the Majority applied the standard correctly and neither "viewed the evidence in a light most favorable to Claimant" nor "drew all reasonable inferences therefrom." In fact, I believe it did just the opposite.

With regard to Finding of Fact 14, the Majority places emphasis on the fact that Claimant did not cry uncontrollably *immediately* after the meeting about the "hanging noose," rather, she cried uncontrollably after the Feuchenberger meeting when he stated he did not feel safe working beneath Claimant's crane. For the Majority to focus on this picayune distinction as the basis to reverse is not in accord with the appropriate standard of review.

Whether Claimant immediately cried uncontrollably, cried later, or stood there with her jaw on the ground was not the dispositive issue. The salient issue was whether that incident, together with the "N word" incident, and other incidents, such as when Claimant's co-workers told her she should not be there because she was female, created an abnormal working environment which caused Claimant's psychological injury.

Claimant testified about the inappropriate hostile gender-based and racial remarks and incidents and the *WCJ credited her testimony*. There was *no dispute* that at least three race and/or gender based incidents occurred which involved: (1) the statement that "females should not work in the foundry;" (2) the noose hanging in the foreman's office, and (3) the incident where Claimant's supervisor stated to Claimant that he would not be treated like a "N

word" on his day off. The Employer's witnesses confirmed that these events took place. There is also no dispute that Hurley told Claimant that "females should not be working in the foundry." Hockley testified that after seeing the noose hanging in Zimmerman's office, Claimant was very upset. These comments were made directly by or in front of Claimant's direct supervisor and/or the CEO and the director of safety. Claimant described being shocked and upset by the incidents. She responded to Zimmerman by pointing out how derogatory it was to say the "N word" right in front of her. With regard to the hanging noose incident, Claimant "could not believe" her eyes. She immediately summoned a foreman and said that "somebody needs to take that down."

The Board agreed with the WCJ that these events, taken together, constituted an abnormal working condition, and that the *cumulative effect of these events*, which occurred in a four month time span from May–August 2009, (and which had been preceded by similar events throughout Claimant's employment) was a diagnosis of atypical depression. The WCJ credited Claimant's testimony that these events culminated in her losing control one day at work and leaving to see a doctor. Hearing Transcript, December 9, 2010, at 68–73; R.R. at 15–22.

Essentially, the Majority is overruling the WCJ's credibility determinations and ignores that the WCJ based its conclusion concerning an abnormal working condition on the culmination of several specific events which occurred over a five-month period.

The Majority again focuses on the trivial when it concludes that Finding of Fact 38, that Dr. Dissinger's "testimony" was competent, was not supported by substantial evidence because Dr. Dissinger did not "testify." First, clearly, by the word "tes-

timony" the WCJ was referring to the medical opinions of Dr. Dissinger which were presented as evidence by Claimant. The WCJ specifically stated that his conclusion was based on, *inter alia,* "Claimant's testifying (report) expert, Howard Dissinger."

Further, the Majority concludes that Dr. Dissinger's opinions were not supported by substantial evidence because they did not reference the noose or the "N word."

Although the noose incident and the "N word" were not directly referenced in his report, the nexus between the specific abnormal working conditions and Claimant's psychic injury was set forth in the records of both Dr. Wampler, the primary care provider, and Dr. Bagian, the U.S. Healthworks panel physician. Both Dr. Wampler and Dr. Bagian evaluated Claimant before she was referred to Dr. Dissinger, and their treatment records include specific references to Claimant's complaints of the "N word" and inappropriate gender and race-based comments. Dr. Dissinger listed the specific work conditions which resulted in Claimant's atypical depression, including: (1) problematic male co-workers; (2) harassment; and (3) a stressful and disagreeable work environment.

When Dr. Dissinger's report is read in conjunction with Dr. Wampler's and Dr. Bagian's reports, and the undisputed evidence of the gender and race-based harassment Claimant faced in the workplace, the only reasonable inference to draw is that Dr. Dissinger was referring to those events. The record is replete with testimony from both sides that these reprehensible incidents did occur and that Claimant became upset to the point where she lost control at work and left to see a doctor. From the time Claimant first sought medical treatment for stress, she indicated that it was due to continual harassment at work based on her gender and race. Dr. Wampler stated: "The 'N word' has been used by her co-workers and due to the fact that she wants to keep her job she has not done more about the incident than ask for an apology."

To reverse the Board on the grounds that the references in Dr. Dissinger's report to "harassment," "problematic male co-workers" and "a stressful and disagreeable work environment" were not specific enough to implicate the gender and race-based incidents at issue goes directly against our Supreme Court's caution in *Payes v. Workers' Compensation Appeal Board (Commonwealth Pa. State Police)*, 621 Pa. 564, 79 A.3d 543, 549 (2013), "such a fact-sensitive inquiry requires deference to the fact finding functions of the WCJ and, accordingly, we limit our review of those factual findings to determining whether they are supported by the evidence and overturn them only when they are arbitrary and capricious." The WCJ's finding that Dr. Dissinger treated Claimant in connection with her exposure to the above racial and gender-based incidents was certainly not arbitrary or capricious in these circumstances.

With regard to Findings of Fact 39 and 40, the Majority basically concludes that the WCJ had no valid grounds to reject the expert opinions of Dr. Cohn who testified that Claimant's condition was a "subjective reaction to the normal and expected demands of Employer." This ties in with the Majority's conclusion Claimant failed to prove she sustained a work injury as a result of abnormal working conditions.

In classifying working conditions as normal or abnormal, this Court does not employ a bright line test or a generalized standard, but instead, considers the specific work environment of the claimant. *RAG (Cyprus) Emerald Resources, L.P. v. Workers' Compensation Appeal Board (Hopton)*, 590 Pa. 413, 912 A.2d 1278, 1288

(2007). This Court's review is limited to determining whether those events gave rise to abnormal working conditions. *Community Empowerment Association v. Workers' Compensation Appeal Board (Porch)*, 962 A.2d 1 (Pa.Cmwlth.2008).

Once again, the work environment of Claimant was not disputed. Claimant was the only African–American female in the workplace of approximately 200 males. It is uncontested that the incidents as described by the WCJ actually occurred. Zimmerman used the "N word" when he told Claimant that he did not want to be treated like a "N word" on his day off. Shortly thereafter Claimant saw a noose hanging from her foreman's shared office. Both Claimant's and Employer's witnesses testified that these events occurred. Critically, the WCJ did not credit Employer's explanation of the hanging noose in the foreman's office, i.e., that it was a private joke between Zimmerman and Smith. The WCJ believed the hanging noose incident was intentional and directed at Claimant.

I believe the Majority errs by reversing the Board and ignoring that the repeated acts of racial and gender-based harassment created abnormal working conditions in this situation. As the WCJ poignantly observed:

> It should be abundantly clear that any reasonable person, let alone a reasonable African–American female in an all male and virtually all white environment, would perceive references to the '[N word],' a noose, and comments about refusal to work under her crane, or that women don't belong, as degrading and hostile, and certainly not part of a normal working environment. The reasons that the word '[N word]' constitutes wholesale racial defamation [are] because it attributes very degrading personal and racial characteristic[s] to Afri-

can–Americans. The association of a noose with lynching's, a historical form of domestic violence against African–American[s], needs no further explanation.

WCJ Decision at 7–8.

I would affirm the Board.

Judge LEAVITT did not participate in the decision in this case.

Judge McCULLOUGH joins in this Dissent.