# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

ConAgra Foods Packaged Foods, LLC, :
                         Petitioner :
                                    :
             v.                     :
                                    :
Workers' Compensation               :
Appeal Board (Heimbach),            : No. 689 C.D. 2018
                         Respondent : Submitted: August 31, 2018


BEFORE:   HONORABLE ROBERT SIMPSON, Judge
          HONORABLE CHRISTINE FIZZANO CANNON, Judge
          HONORABLE DAN PELLEGRINI, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON          FILED:  October 15, 2018


ConAgra Foods Packaged Foods, LLC (Employer) petitions for review of an order by the Workers' Compensation Appeal Board (Board) affirming the decision and order of Workers' Compensation Judge Kenneth Walsh (WCJ) granting in part Claimant Dorothy M. Heimbach's (Claimant) Fatal Claim Petition (Claim Petition) based upon the death of David Heimbach (Decedent) filed against Employer pursuant to the Workers' Compensation Act (Act).[1]  Upon review, we affirm.

Decedent passed away while at work on July 29, 2014.  On July 24, 2015, Claimant filed the Claim Petition alleging Decedent's death resulted from a probable acute myocardial infarction while in the course and scope of his

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2708.

employment with Employer. The Claim Petition alleged total dependency and sought widow benefits for Claimant.

The WCJ conducted multiple hearings and, on April 19, 2017, circulated a decision and order (WCJ Decision) granting the Claim Petition in part to the extent it sought benefits for Claimant as Decedent's widow.[2] Employer appealed and the Board affirmed by opinion and order dated April 20, 2018 (Board Opinion). This appeal followed.[3]

Employer now claims that the Board erred in affirming the WCJ Decision granting Claimant benefits because the record lacked substantial evidence to support an award of fatal benefits. We do not agree.

"In a claim petition, a claimant bears the burden of proving all the necessary elements for an award of workers' compensation benefits." *Holy Redeemer Health Sys. v. Workers' Comp. Appeal Bd. (Lux)*, 163 A.3d 498, 503 (Pa. Cmwlth. 2017). "Within the context of a fatal claim petition, the surviving family member must substantiate the elements necessary to merit an award of benefits." *City of Philadelphia v. Workers' Comp. Appeal Bd. (Kriebel)*, 29 A.3d 762, 769 (Pa. 2011).

---

[2] The WCJ Decision denied the Claim Petition to the extent it sought benefits for James Austin Fay-Unangst, a minor who lived with Claimant and Decedent prior to Decedent's passing and who continued to live with Claimant at the time of the Claim Petition, as Decedent's dependent. *See* WCJ Decision at 44-45. Accordingly, because Claimant was Decedent's widow and Decedent had no dependent children at the time of his death, the WCJ Decision awarded Claimant 51% of Decedent's wages and reasonable burial expenses not to exceed $3,000.00. *See* Section 307 of the Act, 77 P. S. § 561.

[3] This Court's "scope of review is limited to determining whether constitutional rights have been violated, whether an error of law was committed and whether necessary findings of fact are supported by substantial evidence." *Morocho v. Workers' Comp. Appeal Bd. (Home Equity Renovations, Inc.)*, 167 A.3d 855, 858 n.4 (Pa. Cmwlth. 2017); *see also* Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

2

> Those elements encompass establishment of a work-related injury or occupational disease, impact on the earning capacity of the employee, and, in the case of a fatal claim petition, that this injury or disease was a substantial contributing cause in bringing about the death of that employee.

*Id.* "As with all claim petitions, the elements necessary to support an award [for a fatal claim petition] must be established by substantial evidence." *Gibson v. Workers' Comp. Appeal Bd. (Armco Stainless & Alloy Prod.)*, 861 A.2d 938, 943 (Pa. 2004). "Substantial evidence is such relevant evidence a reasonable person might find sufficient to support the WCJ's findings." *Frog, Switch & Mfg. Co. v. Workers' Comp. Appeal Bd. (Johnson)*, 106 A.3d 202, 206 (Pa. Cmwlth. 2014).

Additionally, "[j]ust as with any other type of injury, in order for a decedent's fatal heart attack to be compensable, the claimant must establish that the heart attack was causally related to the decedent's employment." *Dietz v. Workers' Comp. Appeal Bd. (Lower Bucks Cty. Joint Mun. Auth.)*, 126 A.3d 1025, 1030 (Pa. Cmwlth. 2015). "If the causal connection is not obvious, the connection must be established by unequivocal medical testimony." *Id.* "Medical evidence is considered unequivocal if the medical expert, after providing a foundation, testifies that in his medical opinion, he thinks the facts exist." *Craftsmen v. Workers' Comp. Appeal Bd. (Krouchick)*, 809 A.2d 434, 439 (Pa. Cmwlth. 2002). Our Supreme Court has determined that, in cases where an employee suffers a fatal heart attack while performing normal work duties, competent medical testimony evidencing a causal connection between the work duties and the heart attack can entitle a claimant to fatal claim benefits. *Workmen's Comp. Appeal Bd. v. Bernard S. Pincus Co.*, 388 A.2d 659, 664 (Pa. 1978).

Multiple lay witnesses testified before the WCJ in this matter. Claimant testified that Decedent worked for Employer for 41 years and had been a forklift driver during the final two years of his employment. WCJ Decision Findings of Fact (F.F.) 6. Decedent typically worked an 8-hour shift for Employer, which sometimes extended to a 10-hour shift. F.F. 6. Claimant testified that Decedent returned home tired from work and that his clothes could also be sweaty in the summer, although not in the winter. F.F. 6. Claimant testified that Decedent would complain of chest discomfort which he thought was occasioned by indigestion. F.F. 7. Claimant explained that a doctor prescribed Decedent Prilosec in the spring of 2013, but that he continued to complain of indigestion multiple times a month thereafter. F.F. 8-9. Claimant explained that Decedent telephoned her during his break around 6 or 6:30 p.m. on the day of his death,[4] and made no indication that he was having any physical issues at that time. F.F. 13. Additionally, Claimant testified that two of Decedent's brothers died from heart attacks. F.F. 14.

Decedent's co-worker William Webb also testified before the WCJ. F.F. 16. Webb explained that he and Decedent had started working for Employer on the same day 42 years prior to the hearing and that he was the coordinator of Employer's labeling and packaging area and was Decedent's supervisor at the time of Decedent's passing. F.F. 16. Webb explained that he would see Decedent approximately four to five times per shift. F.F. 16. Webb further explained that Decedent's job involved operating a forklift 70% of the time. FF. 19. He explained that, on the whole, Decedent's job did not involve much lifting, but that two to four times a week he might be required to move two or three 15-pound product cartons

---

[4] Claimant explained that she and Decedent might only see each other one or two times a week because they worked opposite shifts. F.F. 6. As a result of their schedules, Claimant did not see Decedent on the day he passed away. F.F. 13.

4

from one pallet to another in a process known as a "changeover." F.F. 20. Additionally, Decedent's position involved occasionally climbing a ladder to dislodge obstructions created by the cans of product becoming jammed between the cooker room above and the area where the cans descend onto their floor for packaging. F.F. 20. Webb testified that such jams could occur as frequently as two to three times a night or as infrequently as once every two or three weeks. F.F. 20. Webb did not recall either a changeover or a can jam occurring on the evening of July 29, 2014. F.F. 20, 24.

Webb explained that, on the evening of Decedent's demise, Webb spent a coffee break with Decedent around 7:00 p.m., during which they discussed deer hunting. F.F. 21. Webb did not recall Decedent sweating or being flushed or appearing to be in any physical distress at that time, and Decedent did not complain to Webb of any discomfort or other physical problems. F.F. 21.

At approximately 8:00 p.m., while back in his office, Webb received a pager call that a man had passed out. F.F. 17. Webb left his office and arrived at the scene[5] to find Decedent slumped over on his forklift. F.F. 17. Webb checked Decedent's breathing and pulse and, finding neither, immediately went back to his office where he called 911. F.F. 17. Upon returning to the scene, Webb observed Kelly Peachy, Employer's on-site EMT, performing CPR on Decedent. F.F. 17. Webb remembered that Peachy requested that another employee retrieve Employer's defibrillator, and that a defibrillator was retrieved in roughly four to five minutes, but the paramedics arrived before Peachy could use the defibrillator. F.F. 17.

_____

[5] Webb testified the temperature in the area where Decedent was found, on account of the machinery, was generally around 10 to 15 degrees warmer than the outside temperature. F.F. 18. Although it was mid-summer, Webb further testified that he did not recall the evening being extremely hot or humid. F.F. 18.

5

David Hoover also testified before the WCJ. *See* F.F. 26-39. Hoover, a 30-year veteran of Employer, worked the same shift and performed the same duties as Decedent. F.F. 26. According to Hoover, he and Decedent's job required operating a forklift approximately 70% of the time, which he indicated was not physically demanding. F.F. 27, 34. In addition to operating forklifts, Hoover explained that the position required monitoring supply lines on a computer which, while a sedentary task, required constant diligence and was quite tiring mentally. F.F. 29. Hoover explained that the monitoring was stressful because errors could result in product recalls that cost Employer large sums of money and could result in write-ups or other discipline, up to and including unpaid time off. F.F. 29.

Hoover explained that he would cross paths with Decedent approximately 40 to 50 times in the course of an evening while executing their forklift duties. F.F. 32. Hoover recalled that, on the evening Decedent died, he spoke with Decedent a number of times about hunting and fishing. F.F. 32. Prior to collapsing, Decedent did not complain or otherwise display any signs of physical problems. F.F. 32. In fact, Decedent told Hoover that he was fine. F.F. 32. Hoover estimated he last saw Decedent 30 minutes before his collapse and stated that, at that time, he did not observe anything that indicated Decedent was having any physical issues. F.F. 32.

When called over to Decedent's location on the night of Decedent's collapse, Hoover observed Decedent unconscious in the seat of his forklift, which was parked in front of a running pedestal fan. F.F. 28. Hoover did not recall anything on or around the forklift to indicate Decedent had been actively working when he lost consciousness. F.F. 36. He checked Decedent's vital signs, but found none. F.F. 28. Hoover stayed at the site approximately 30 to 45 minutes and

6

observed Peachy perform CPR on Decedent. F.F. 28. Although he did not remember the specifics of the weather on the evening of Decedent's death, Hoover acknowledged that the area where Decedent was found was typically 10 to 15 degrees warmer than the outside temperature. F.F. 38. Hoover also recalled placing his own forklift in front of a fan that evening due to heat. F.F. 30-31.

Daniel Baker, who was retired after having worked 42 years for Employer, also testified before the WCJ. *See* F.F. 40-49. Baker explained that the job of forklift operator could be physically demanding if jams occurred, but that it was consistently more mentally stressful than physically stressful, given the possibility of being written up or getting unpaid time off if errors occurred. F.F. 47-48. Baker explained that he worked and became friends with Decedent over the course of 30 years. F.F. 41. He testified that, starting in the year 2000, Decedent began complaining about indigestion while on the job and also during their annual fishing vacations in Canada. F.F. 42. Baker would occasionally provide Decedent with antacids that would seem to help. F.F. 42. He also suggested to Decedent that he see a doctor about his ongoing issues. F.F. 43. On the evening of Decedent's death, Baker explained he saw Decedent around 3:00 p.m. at shift change, and that Decedent appeared fine throughout their 10 to 15 minute conversation. F.F. 46.

Peachy testified that she was on-site in the occupational health office at Employer's facility on July 29, 2014, when she received a radio call regarding an unresponsive individual in the plant. F.F. 50. Peachy immediately collected her medical bag and equipment and proceeded to Decedent's location, where she arrived within two minutes. F.F. 50, 51. Upon arrival, she observed Decedent slumped over

7

in his forklift, unresponsive, with pale skin and blue lips.[6] F.F. 50. She immediately commenced CPR and directed a bystander to retrieve the defibrillator. F.F. 50. After performing CPR for approximately 10 minutes, an Advanced Life Support (ALS) team arrived, to whom she handed over Decedent's care. F.F. 50, 54. Peachy explained that she would have administered the defibrillator immediately, but that it arrived after the ALS team had taken over care. F.F. 50. Peachy testified that Decedent never regained consciousness. F.F. 53.

Dale Rovenolt, a palletizer operator, who worked the same shift as Decedent, also testified. *See* F.F. 55-62. Rovenolt explained that he was alerted to Decedent's situation by another co-worker. F.F. 56. Rovenolt ran to Decedent, found no pulse, and then waited for Peachy to arrive. F.F. 56. He explained that he spoke to Decedent only 10 to 20 minutes prior, while Decedent sat at his desk eating ravioli from a can. F.F. 57. Rovenolt testified that, at that time, Decedent did not complain of any physical problems and appeared completely normal. F.F. 57. Additionally, Rovenolt did not remember the weather being particularly hot or the workload being appreciably out of the ordinary on that evening, although he did state the job of forklift operator could be demanding both physically and mentally. F.F. 56, 59-60.

Second-shift employee Robert Gardner also testified before the WCJ. *See* F.F. 63-68. Gardner testified he saw Decedent at his desk during the shift on July 29, 2014, and that Decedent appeared normal. F.F. 65. About an hour and a half later, Gardner found Decedent slumped on his forklift. F.F. 64. Thinking him asleep, Gardner called to Decedent. F.F. 64. Receiving no reply, Gardner shook

---

[6] Peachy testified that, in her experience, an individual's lips become blue within 6 minutes of oxygen deprivation. F.F. 50.

Decedent's hand, which was limp. F.F. 64. Decedent did not respond to Gardner's attempts to rouse him, so Gardner instructed another employee to seek help. F.F. 64. He then waited with Decedent until Peachy arrived to render medical assistance within five minutes. F.F. 64. Gardner also testified that he remembered nothing abnormal about either the weather or the workload on the day in question. F.F. 65-66.

In addition to the lay witness testimony, the WCJ also received a number of documents into evidence, including Decedent's death certificate, a job description for Decedent's job – label lines line support – created by Decedent's co-worker entitled "Duties of Claimant's Job Sheet" (job description), and a consultant-created job analysis report. *See* F.F. 69-71. Decedent's death certificate listed his cause of death as "sudden cardiac arrest" and "probable acute myocardial infarction." F.F. 69. The job description explained that the normal duties of the forklift operator included, among other things, operating forklifts to unload tractor trailers, supplying the packaging lines with necessary supplies, and clearing supply lines jams. Exhibit C-3. The job description indicated that the majority of the position functions are performed using a forklift, and that mounting and dismounting the forklift would be required multiple times throughout a shift. Exhibit C-3. A number of Decedent's testifying co-workers acknowledged the accuracy of the job description. F.F. 23, 27, 70.[7] Additionally, Employer entered into evidence a document entitled "WorkSmart Analysis of the Label Line Support – Label Line," a

---

[7] Hoover and Webb each confirmed the accuracy of the job description. *See* F.F. 23, 27. Hoover testified that forklift operator responsibilities varied, but that such employees would perform some of the tasks listed in the job description on any given day. F.F. 27. Likewise, Webb testified the job description was accurate except for the listed requirement that employees wear a hard hat while operating forklifts, which he did not think was correct. F.F. 23.

consultant-prepared description/assessment of Decedent's forklift operator job (WorkSmart analysis). F.F. 71. The WorkSmart analysis indicated that Decedent's job involved occasional 45 to 75 pound two-hand lifting and intermittent lifting of less than 20 pounds. F.F. 71. Additionally, the WorkSmart analysis found that the job required a frequent hand grasp maximum of 50 pounds, a frequent pinch factor of 70 pounds, and an occasional static push-pull feature at a maximum of 20 pounds. F.F. 71. The WorkSmart analysis further listed the forklift operator position as 80% sitting, 10% standing, and 10% walking. F.F. 71. Based on these figures, the WorkSmart analysis graded the forklift operator job as a "Level (4) Intermediate" position on a scale of one to six. F.F. 71.

Additionally, the WCJ received the testimony of two medical experts: Jeffrey Garrett, M.D., for Claimant, and Basil RuDusky, M.D., for Employer. *See* F.F. 77-178.[8] The doctors agreed that the records and testimony indicated that Decedent suffered from an underlying, undiagnosed coronary artery disease, a progressive disease for which the classic symptoms include chest pain that can be mistaken for indigestion, shortness of breath, palpitations, and decreased exercise capacity. F.F. 81-85, 146, 152, 155. Both doctors also agreed that Decedent died as the result of an episode of myocardial ischemia that triggered ventricular tachycardia (arrhythmias) and ventricular fibrillation, which in turn led to cardiac arrest. F.F. 155. In short, Decedent died of a heart attack. F.F. 147. The doctors disagreed, however, as to whether Decedent's job as a forklift operator substantially contributed to his death. F.F. 152.

---

[8] The WCJ received the transcripts of Dr. Garrett's July 12, 2016 deposition and Dr. RuDusky's September 22, 2016 deposition in lieu of requiring their live testimony. F.F. 77, 138.

Dr. Garrett stated that the Level 4 work activities indicated in the WorkSmart analysis would have been sufficient in someone with preexisting heart disease to increase that person's heart rate to the point where that person may become ischemic resulting in sudden cardiac death. F.F. 107-109. Accordingly, Dr. Garrett opined:

> I believe [Decedent] had a sudden cardiac death likely due to an arrhythmia, which is the electrical disturbance we talked about earlier, secondary to myocardial ischemia brought on by his activities in the workplace superimposed of course on his pre-existing coronary disease.

F.F. 107.

Dr. RuDusky testified, on the other hand, that the witnesses' testimony did not reveal any evidence that, during the shift when he died, Decedent was experiencing an adverse reaction to any workplace stimuli. F.F. 146. He noted that Decedent did not exhibit any of the classic signs of a cardiac event. F.F. 146. While he agreed with Dr. Garrett as to Decedent's cause of death, Dr. RuDusky saw no evidence in the medical record or the testimony that physical or mental stress brought on by Decedent's work activities, work environment, or any attendant stress from either caused Decedent's death. F.F. 149.

The WCJ found the testimony of all lay witnesses credible and that Decedent's job description as set forth in the WorkSmart analysis was likewise credible. F.F. 179-180. Additionally, the WCJ found credible, and adopted, Dr. Garrett's testimony that Decedent's work activities as outlined in the WorkSmart analysis constituted a substantial contributing factor in Decedent's death. F.F. 185.

Conversely, the WCJ did not find credible Dr. RuDusky's testimony that Decedent's work activities played no role in occasioning his heart attack. F.F.

11

186-88. The WCJ based this finding on significant inconsistencies in Dr. RuDusky's testimony assessing the possible contribution of Decedent's work duties to his demise. F.F. 186-88. Specifically, the WCJ found the incongruity between Dr. RuDusky's testimony that the activities described in the job description alone could have played a role in Decedent's death and his subsequent reversal of that opinion inconsistent enough to deem Dr. RuDusky's causation conclusions not credible. F.F. 188.

Based on the above evidence that Decedent was found stopped in front of a fan in the operator's seat of a forklift, the WCJ determined that Decedent had resumed his work duties subsequent to being observed eating raviolis from a can. F.F. 182. The WCJ further found that Decedent's work activities were a substantial contributing factor in his death from a heart attack on the evening of July 29, 2014. F.F. 190. Accordingly, the WCJ concluded that Claimant carried her burden and was entitled to fatal claim benefits. *See* Conclusions of Law 2-3.

The Board affirmed the WCJ. *See* Board Opinion at 14. The Board noted that Dr. Garrett's testimony, which the WCJ deemed credible, causally related Decedent's normal job duties and the cardiac event that led to his death. *Id.* at 14-15. The Board further noted that, "[w]here [a] decedent was performing his usual job assignment at the time of the fatal heart attack, and the connection between the work and the heart attack was supported by competent medical testimony, the claimant was entitled to compensation." *Id.* at 15. To the extent Employer argued that the lay witness testimony established that Decedent was not performing "Level 4" activities on the day of his death, the Board noted that none of the testimony established that Decedent was performing duties inconsistent with the normal duties the WorkSmart analysis credibly described as "intermediate" in terms of average

12

required physical exertion and which duties Dr. Garrett credibly, consistently, and certainly testified would contribute to a cardiac event. *Id.* at 15-16.

After thorough review, we conclude that the Board's determination is supported by substantial evidence and represents neither an error of law nor a violation of Employer's constitutional rights. The WCJ credited the lay witness testimony and the testimony of Dr. Garrett that Decedent's work duties substantially contributed to his cardiac event and death. "The WCJ has complete authority over questions of credibility, conflicting medical evidence and evidentiary weight." *Dietz*, 126 A.3d at 1029 n.5. The WCJ did not credit Dr. RuDusky's testimony that Decedent's underlying coronary disease on its own caused Decedent's death. Viewed in its entirety, the WorkSmart analysis, the testimony of the lay witnesses regarding Decedent's normal duties, and the WCJ's conclusion that Decedent had resumed these duties prior to his demise, together with the testimony of Dr. Garrett that such duties would contribute to a cardiac event in an individual with preexisting coronary issues, entitle Claimant to the fatal claim benefits awarded by the WCJ and affirmed by the Board in this matter.

Employer also claims the WCJ improperly discredited Dr. RuDusky's testimony based on an alleged misapprehension about his testimony. *See* Employer's Brief at 25-29. We agree with the Board that credibility determinations are the province of the WCJ and are entitled to deference from reviewing courts. Board Opinion at 16-17; *see also Casne v. Workers' Comp. Appeal Bd. (Stat Couriers, Inc.*, 962 A.2d 14, 19 (Pa. Cmwlth. 2008) (stating that the WCJ determines the credibility of witnesses and the weight to be accorded evidence and substantial deference is due the WCJ's determinations); *Pincus*, 388 A.2d at 664 (noting that conflicts in evidence between medical experts are to be resolved by the WCJ, who

13

determines the weight and credibility afforded to witness testimony). This Court cannot overturn the WCJ's credibility determination unless "it is arbitrary and capricious or so fundamentally dependent on a misapprehension of material facts, or so otherwise flawed, as to render it irrational." *Casne*, 962 A.2d at 19.

Here, the WCJ found "significant inconsistency in Dr. RuDusky's testimony regarding the impact of the job descriptions in assessing the role of [Decedent's] work activities in [Decedent's] death." F.F. 186. The WCJ found Dr. RuDusky at one point conceded he could rely completely on the job description to determine causation, and then later refused to acknowledge that such a causation determination was possible. F.F. 186-188. Employer alleged the WCJ erroneously determined that Dr. RuDusky contradicted himself by testifying at one point that the activities discussed in the job description could cause a heart attack and then later refused to concede the fact on cross-examination. *See* Employer Brief at 25-29. Employer argued instead that Dr. RuDusky's deposition transcript shows that he merely did not agree that the job description on its own was sufficient to warrant a conclusion that the job substantially contributed to Decedent's death, and that he consistently testified to that belief. *Id.* In deciding this claim, the Board indicated that it reviewed the testimony and concluded that the WCJ's decision did not demonstrate a misunderstanding of the evidence. Board Opinion at 16. Upon our review of the pertinent testimony, we agree that there was no misapprehension of the testimony to undermine the credibility determinations. Consequently, there is no basis to overturn the WCJ's credibility determinations. *See Casne*, 962 A.2d at 19.

For the foregoing reasons, we affirm the Board's order affirming the WCJ Decision granting in part Claimant's Fatal Claim Petition under the Act.

_____
CHRISTINE FIZZANO CANNON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

ConAgra Foods Packaged Foods, LLC, :
                     Petitioner :
                                    :

              v. :

Workers' Compensation :
Appeal Board (Heimbach), : No. 689 C.D. 2018
                    Respondent :

## O R D E R

AND NOW, this 15th day of October, 2018, the April 20, 2018 order of the Workers' Compensation Appeal Board is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge