**COMMUNITY EMPOWERMENT ASSOCIATION, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (PORCH), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Aug. 22, 2008.

Decided Nov. 25, 2008.

Keith R. Mason, Pittsburgh, for petitioner.

Douglas A. Williams and Sandra W. Kokal, Pittsburgh, for respondent.

BEFORE: LEADBETTER, President Judge, and FRIEDMAN, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

Community Empowerment Association (Employer and CEA) petitions for review from an order of the Workers' Compensation Appeal Board (Board) that affirmed the decision of a Workers' Compensation Judge (WCJ) granting a Claim Petition filed by Lillian Porch (Claimant). We affirm.

Claimant filed a Claim Petition alleging she sustained psychological injuries as a result of her employment as a case manager for Employer. In support of her Petition, Claimant testified that Employer provides social services, including after school programs for youths to help them obtain employment. Claimant stated that Employer's President, Rashad Byrdsong, made unwanted sexual advances towards her. According to Claimant, he made comments like he thought she was a lesbian because he had not seen her with any

men and that her breasts and buttocks were shaped like a butterfly. Claimant further explained that Mr. Byrdsong stated he needed to stay away from her office because he was trying to control himself. He asked her if she slept with certain men and informed her that he would come over to her house, even at 2:00 a.m. Claimant indicated that after repeatedly denying Mr. Byrdsong's advances he began acting really mean to her. Claimant explained that she reported these incidents to her supervisor, Daytona Gordon.

Claimant, who is a Christian, further testified that most of her coworkers were Muslim or "Gods and Earths." According to Claimant, staff meetings were held and she would be held out by Mr. Byrdsong for being non-Muslim. She indicated the meetings could go several hours and Mr. Byrdsong would discuss religious topics such as the power of wrapping up, meaning to put the traditional Islamic headgarb on, and finding funding to build a Mosque. Claimant stated that her coworkers would come into her office and tell her that she should wrap up. Claimant further explained that a man named Sheikh Tajohni was given an office and he would give spiritual guidance.[1] She asserted that he went around the premises burning incense, doing chants, and splashing water.

Claimant last worked for Employer on December 16, 2005. She stated that she could continue handling what she believed was a heavy workload but for the continuous sexual and religious harassment. Claimant found alternative employment on October 2, 2006.

Claimant submitted reports in support of her claim, including a September 26, 2006 psychology report of Thomas M. Eberle, Ph.D., who examined her on Au-

gust 8, 2006 and September 18, 2006. Claimant provided Dr. Eberle a history that she experienced religious and sexual harassment while working for Employer and that the harassment increased in severity with the passage of time. Dr. Eberle diagnosed Claimant with major depressive disorder and opined that it was in remission. He further opined Claimant developed generalized anxiety disorder and panic disorder with agoraphobia as a result of the incidents that occurred while working for Employer but he indicated that these conditions were resolved. Dr. Eberle stated that these disorders were directly caused by Claimant's gender, sexual, and religious discrimination endured while working for Employer. According to Dr. Eberle, Claimant cannot return to work for Employer without risking a severe relapse. He noted, however, that Claimant is free to work elsewhere.

Employer presented the testimony of Mr. Byrdsong who agreed that religious discussions took place during staff meetings. Nonetheless, he stated Employer is a multi-cultural organization and any discussions that took place were for the purposes of addressing the needs of the community that it serves. Mr. Byrdsong denied Claimant was ever held out as a non-Muslim or prompted to wrap up. Mr. Byrdsong agreed that Sheikh Tajohni was provided office space to conduct his spiritual advising work. According to Mr. Byrdsong, however, he was not there to provide advice to the staff, only his own clientele. Mr. Byrdsong agreed that on one occasion, the Sheikh conducted a ceremony to purify the organization. He explained that that ceremony was not a facet of Islam, but rather an African–American tradition. Regardless, Mr. Byrdsong indicated Sheikh Tajohni was instructed to discontinue any such activi-

1. Sheikh "Tajohni" is also referenced as Sheikh "Dejalo" throughout the record

ties. He denied Claimant's allegations of sexual harassment.

Mr. Byrdsong stated that in addition to being Employer's CEO, he is the Amir of Al Mumin, the Mosque he attends. A brochure was presented concerning the Al Mumin economic development project. According to Mr. Byrdsong, he was asked to help with this project on a personal level, not a business level. He agreed, however, that the brochure identifies the address for the Al Mumin development project as Employer's address. He further agreed that he permitted Al Mumin to use Employer's facility as a meeting place. During Mr. Byrdsong's testimony, the following dialogue took place:

Q. Other than [allowing Al Mumin to use Employer's facility as a meeting place and] providing an address, did CEA, and again I'm not asking about Mr. Byrdsong personally, but did CEA do anything else for Al Mumin?

A. No.

Q. I would like you to take a look with me at the second page of the brochure. It's the one that says History and Direction at the top. I'm going to read a sentence to you and I'm going to ask you to comment on it.

According to the brochure, it says, "Currently there is a growing population of 10,000 Muslims in the area and several strong entities, **including our partner and driving force, Community Empowerment Association,** an institution performing as a servant to the nation in the interest of disadvantaged people."

. . .

Q. Is that an accurate sentence,—

A. Yes.

Reproduced Record at 213–214a. (R.R. at ——). (Emphasis added).

Employer further presented the testimony of Daytona Gordon, its deputy director, who agreed that Claimant was never required to wrap up as a condition of her employment. Ms. Gordon acknowledged, however, that Claimant was invited to Eid prayer on one occasion and was told that if she attended, she would have to wrap. Ms. Gordon stated that Claimant did make complaints concerning Mr. Byrdsong. According to Ms. Gordon, Claimant never mentioned anything specific. Rather, she would state just that he made her feel uncomfortable. Ms. Gordon denied Claimant ever approached her in regards to any purported sexual or religious harassment. Ms. Gordon, on cross-examination, acknowledged that at an unemployment compensation hearing, she was questioned by Claimant about Claimant's allegations of sexual harassment whereupon her response was "I didn't feel at the level you described it to me, anything was warranted." R.R. at 244a. Ms. Gordon stood by her position and reiterated that Claimant never made a complaint with any specificity towards her regarding any sexual harassment.

Angela Jackson, Gary Hudson, and Dauod Lane also testified on behalf of Employer. They provided explanation as to what it means to be a member of Gods and Earths. According to their statements, Gods and Earths is not a religion. Rather, it is a culture. Mr. Hudson summed things up best by stating "[r]eligion gives you this type of structure over here and leads you to God in that sense, where our culture looks more to God internally or looks more to, like, you know, self definition and divinity within the self and you know, growth and development." R.R. at 292a.

Employer further presented the psychiatric report of Stuart S. Burtein, M.D. who did not believe Claimant had any condition

that rose to the level of a clinical illness. Instead, he opined Claimant was merely angry over her perceived treatment while working for Employer. While he conceded Claimant could have taken a few days off in December of 2005, there was nothing precluding her from returning to work for Employer.

By a decision circulated August 8, 2007, the WCJ granted Claimant's Claim Petition finding she was subject to religious and sexual harassment at work and that this harassment rose to the level of an abnormal working condition. He concluded Claimant sustained major depressive disorder, generalized anxiety disorder, and panic disorder with agoraphobia. The WCJ granted Claimant's Claim Petition and awarded total disability benefits for a closed period of December 17, 2005 through October 1, 2006. In so doing, he credited the testimony of Claimant based on her presentation in the courtroom, the fact that her testimony was consistent with the information given to her medical providers, and her quick return to the workforce. He rejected the testimony of Mr. Byrdsong based on the fashion in which he carried himself during the proceedings and the fact that he was evasive on certain matters. The WCJ specifically noted Mr. Byrdsong's testimony concerning the Al Mumin economic development project was inconsistent. The WCJ rejected Ms. Gordon's testimony based on the fact that she indirectly admitted in the unemployment compensation proceedings that Claimant made at least one complaint concerning sexual harassment. Moreover, he indicated it was difficult to believe Ms.

Gordon, acting as a supervisor, would not inquire for further detail if, as she stated, Claimant's complaints concerning Mr. Byrdsong lacked specificity. The WCJ credited the testimony of Angela Jackson, Gary Hudson, and Dauod Lane, but found their testimony to have little relevance. He credited Claimant's medical evidence over that submitted by Employer.[2]

In Finding of Fact No. 25, the WCJ stated:

> This adjudicator finds that the events described by the claimant did occur in the manner that she described them. This adjudicator further finds that (sic) sexual and religious harassment that she endured rises to the level of an "abnormal working condition" as that phrase has been interpreted and applied by the appellate courts. It is abnormal for a supervisor to request that one of his employees have sex with him. It is abnormal for a supervisor to comment on the shape of an employees (sic) buttocks and breast, to inquire whether or not the employee is a lesbian, and to ask her if she had slept with other men in the office. It is abnormal for a supervisor to tell his employee that he is staying away from her office because he's trying to "control himself." It is also abnormal for an employer to suggest that an employee read a book about how Muslim women act or to suggest that an employee "wrap up" in a traditional Muslim headdress. It is abnormal to discuss Islam at a company meeting in the manner in which the claimant described that it was discussed. It is also

---

2. The WCJ is the final arbiter of witness credibility and the weight to be accorded evidence and may accept or reject the testimony of any witness in whole or in part. *Greenwich Collieries v. Workmen's Compensation Appeal Board (Buck)*, 664 A.2d 703 (Pa.Cmwlth. 1995). Credibility determinations are not reviewable. *Campbell v. Workers' Compensation Appeal Board (Pittsburgh Post Gazette)*, 954 A.2d 726, (Pa.Cmwlth.2008). *See also Ausburn v. Workers' Compensation Appeal Board (Merrell & Garaguso)*, 698 A.2d 1356 (Pa. Cmwlth.1997).

abnormal for a supervisor to acknowledge each employee's religious or cultural beliefs at the start of a company meeting. Likewise, it is abnormal for an employer to pay its employees to attend services at a mosque. As noted above, the presence of Sheikh Dejalo in a place of business is abnormal.

R.R. at 512a–513a.

■ The Board affirmed the WCJ's decision on February 22, 2008. This appeal followed.[3]

Employer argues on appeal that the WCJ's decision is not supported by substantial, competent evidence. Specifically, it contends there was no corroborative evidence to support Claimant's claims of harassment. Further it asserts Claimant's medical evidence, Dr. Eberle's report in particular, was not based on an accurate and complete medical history and, therefore, is incompetent.[4]

■ A claimant seeking workers' compensation benefits because of a mental stimulus resulting in a disabling psychic injury must show that she has suffered a psychic injury and that that injury is more than a subjective reaction to normal working conditions. *Davis v. Workers' Compensation Appeal Board (Swarthmore Borough)*, 561 Pa. 462, 751 A.2d 168 (2000). In classifying working conditions as normal or abnormal, there is no bright line test or a generalized standard. *See Rag (Cyprus) Emerald Res., L.P. v. Workers' Compensation Appeal Board (Hopton)*, 590 Pa. 413, 912 A.2d 1278 (2007) (granting

benefits to a miner whose foreman repeatedly made crude sexual comments to him that were above and beyond uncivil and joking behavior). Rather, one must consider the specific work environment of the claimant. *Id.*, 590 Pa. at 428, 912 A.2d at 1288. Consequently, compensation is denied for events that are expected in the relevant working environment, whether it is an office worker's change in job title or responsibility or a police officer's involvement in life threatening situations. *Id.* "In assessing whether work conditions are abnormal, we must recognize that the work environment is a microcosm of society. It is not a shelter from rude behavior, obscene language, incivility, or stress." *Philadelphia Newspapers, Inc. v. Workmen's Compensation Appeal Board (Guaracino)*, 544 Pa. 203, 675 A.2d 1213 (1996).

■ Generally, in mental/mental injury cases, corroborative evidence is required to support the claimant's description of the abnormal working environment that caused the injury. *Donovan v. Workers' Compensation Appeal Board (Academy Med. Realty)*, 739 A.2d 1156 (Pa.Cmwlth. 1999). If, however, actual events are described as occurring and found by the WCJ to have occurred, corroborative evidence is not required. *Id.* at 1163. *See also Phila. Elec. Co. v. Workers' Compensation Appeal Board (Miller)*, 164 Pa. Cmwlth.683, 643 A.2d 1186 (1994).

■ In reviewing the WCJ's award of benefits, it is of utmost importance to reit-

---

**3.** Our review is limited to determining whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence and whether constitutional rights were violated. *Sysco Food Servs. of Phila. v. Workers' Compensation Appeal Board (Sebastiano)*, 940 A.2d 1270 (Pa. Cmwlth.2008).

**4.** Employer's arguments address causation on the grounds that there is no evidence to corroborate Claimant's complaints of harassment and that Claimant's medical evidence is incompetent. Assuming these arguments are rejected and that there is sufficient evidence of record to establish causation, Employer does not argue in the alternative that Claimant did not have an earnings loss as a result of her mental injuries.

erate that the WCJ credited Claimant's testimony over that of Mr. Byrdsong and Ms. Gordon. Credibility determinations are not reviewable. *Campbell, Ausburn.* Consequently, the events found by the WCJ to have occurred based on Claimant's credible testimony, which are supported by the contents of the record, are accepted facts. Corroborative evidence is not necessary. *Donovan, Miller.* Our review is limited, therefore, to determining whether these events give rise to abnormal working conditions.

Employer is a professional organization whose business involves community development and assistance to individuals in finding employment. Claimant, as found by the WCJ, was subjected to sexual harassment by her supervisor on multiple occasions that would not be considered acceptable in this professional type of environment.[5] *Hopton.*

The more difficult matter to address is the "religious harassment" that the WCJ found to have occurred. This Court acknowledges that conversations concerning religious faith may take place in any workforce setting. Moreover, the testimony given in this case shows that what one person may perceive as a religious issue, others may consider to be a cultural issue. Regardless, however, whether something is a religious issue or a cultural issue is not the ultimate question. The pivotal questions are whether it can be said that the events that have been described and found to have occurred by the WCJ constitute abnormal working conditions and whether the mental injuries that Dr. Eberle said were caused, in part, by these events developed from subjective reactions to normal working conditions. *Davis.*

Certainly, there are some factual scenarios present in this case where the line between a normal work environment and an abnormal work environment is gray. For instance, Claimant stated she was frequently asked to wear a head garb. The testimony presented by Employer indicated that she was only asked to wrap up once and that was if she decided to attend the Mosque. This factual dispute was apparently resolved by the WCJ's finding "that the events described by the claimant did occur in the manner that she described

---

5. Employer contends that the WCJ failed to consider e-mails that Claimant forwarded that are "not consistent with [Claimant's] position that she was contemporaneously being sexually harassed." Specifically, it focuses on an e-mail Claimant received and forwarded to Ms. Gordon and Asseietou Dieng. The e-mail, best described as an "inspirational forward," reads, in part:

> You like a smooth uncomplicated sunset, just kissing the horizon, you like a strong hand and strong arms to hold you into the night.
> You like your favorite foods fed to you by candlelight and spirited conversation over your favorite drink, a Sunset Martini, shaken AND stirred.
> You like a good movie, sometimes funny, sometimes sad, but always romantically entertaining.
> You like your feet massaged slowly and sensually. You like your back to be kissed,

before, during and after; your arms and legs stroked and your 'lips' kissed ever so gently and sweetly. (blush)
> You like honesty and integrity, you like promises, but only those that are kept. You like confidence and security, you like a heart that beats only for you....

(R.R. at 154a)
This forward was sent to two other females by Claimant. It was not sent to Mr. Byrdsong. Moreover, any argument that Claimant invited Mr. Byrdsong's comments regarding the shape of her breasts and queries regarding what men she slept with is summarily rejected. E-mail forwards such as the one here, though often unwanted and perhaps often unread, are commonplace in the office environment. They are far from abnormal occurrences. Mr. Byrdong's explicit comments, made face to face, are of a distinctly different character than the generic forward referenced by Employer.

them." Finding of Fact No. 25; R.R. at 512. A first request, coinciding with an invite to attend an event, may be viewed as acceptable. Frequent requests, however, may, to some individuals, become unwelcome. Although unwelcome, whether repeated requests create or contribute to an abnormal working condition depends on the circumstances of each case.

Nonetheless, weekly meetings where the Claimant was recognized as the "individual" because she is not Muslim can certainly be considered abnormal in a professional environment. Moreover, whether Sheikh Tajohni's purification ceremony was an Islamic tradition or an African–American tradition, the burning of incense, the chanting, and the splashing of water by a person who was not an employee but was given office space by Employer must be viewed as a departure from the normal business environment.

 Given at least some instances of abnormal religious or cultural harassment in addition to the sexual harassment Claimant endured while working for Employer, we find no error in the WCJ's finding that Claimant was subjected to abnormal working conditions.[6] Inasmuch

as Claimant's medical experts credibly opined her mental injuries were caused by her employment, we see no error in the WCJ's determination to grant Claimant's Claim Petition.[7]

Employer further argues that the WCJ failed to issue a reasoned decision because he failed to consider the record as a whole and that he failed to give due consideration to the testimony of Angela Jackson, Gary Hudson, and Dauod Lane. We disagree.

 Section 422(a) of the Pennsylvania Workers' Compensation Act, Act of June 2, 1915, P.L. 736, as amended, 77 P.S. § 834, provides that all parties to an adjudicatory proceeding are entitled to a reasoned decision. Where the fact-finder has had the advantage of seeing the witnesses testify live and the opportunity to assess their demeanor, a mere conclusion as to which witnesses he deems credible is sufficient to render the decision adequately "reasoned." *Daniels v. Workers' Compensation Appeal Board (Tristate Transp.)*, 574 Pa. 61, 828 A.2d 1043 (2003). In instances where credibility assessments cannot be tied to inherently subjective circumstances, *i.e.* when a witness appears via deposition, some articulation of an actual

---

6. Employer, in its Petition for Review, asserts that holding Employer liable for benefits in this instance because of "mere religious discussion or other religious presence in the workplace is unconstitutional." Employer fails, however, to address the constitutionality of an award in its brief submitted to this Court. As such, this issue is waived. *Muretic v. Workers' Compensation Appeal Board (Department of Labor and Indus.)*, 934 A.2d 752, 758 (Pa.Cmwlth.2007).

7. In regard to Employer's argument that Dr. Eberle's opinion was not based on a complete medical history, we note that Employer contends that although Dr. Eberle was aware Claimant sought therapy for depression and anxiety in 1996, he was unaware of her hospitalization in 1995 for depression. This Court acknowledges that a medical opinion is not

competent if it is based on inaccurate or false information. *Newcomer v. Workmen's Compensation Appeal Board (Ward Trucking Corp.)*, 547 Pa. 639, 692 A.2d 1062 (1997). It is also true, however, that the fact that a medical expert did not have all of the claimant's medical records in formulating his opinion only goes to the weight of the expert's testimony, not its competency. *Coyne v. Workers' Compensation Appeal Board (Villanova Univ.)*, 942 A.2d 939, 955 (Pa.Cmwlth. 2008). Employer does not assert Dr. Eberle had any false information that he relied upon in offering his opinions. Rather, it contends Dr. Eberle did not have a complete medical history. This fact is to be considered by the WCJ when rendering his credibility determinations, *Coyne,* and cannot provide a basis for reversal here.

objective basis for a credibility determination must be offered for the decision to be considered a "reasoned" one. *Id.,* 574 Pa. at 78, 828 A.2d at 1053.

■ On appeal, the prevailing party below is entitled to all inferences that can be reasonably drawn from the evidence. *Krumins Roofing & Siding v. Workmen's Compensation Appeal Board (Libby),* 133 Pa.Cmwlth. 211, 575 A.2d 656 (1990). Moreover, it does not matter that there is other evidence of record that supports a factual finding other than that made by the WCJ. *Hoffmaster v. Workers' Compensation Appeal Board (Senco Prods. Inc.),* 721 A.2d 1152 (Pa.Cmwlth.1998). Rather, the proper inquiry is whether there is any evidence that supports the WCJ's factual findings. *Id.* at 1155.

■ In arguing that the WCJ failed to consider the evidence in its totality, Employer cites portions of the record that if considered, may support a ruling contrary to the one made by the WCJ. Pursuant to *Hoffmaster,* it is irrelevant that there is evidence that would support a finding other than the one made by the WCJ. The fact remains, as indicated above, there is substantial, competent evidence to support the determinations made by the WCJ. As for the WCJ's credibility determinations, he provided objective reasons for his credibility determinations made concerning the medical reports provided. Moreover, he made credibility determinations regarding all witnesses who appeared live before him. Although he provided some objective basis for his credibility determinations for some, but not all, of the witnesses who

testified live before him, a mere conclusion as to whether he found each of these witnesses credible was all that was required. *Daniels.* We must reject Employer's argument that he WCJ failed to issue a reasoned decision.[8]

After a review of the record, we conclude that the Board did not err in affirming the WCJ's decision as all findings are supported by substantial evidence. Accordingly, the order of the Board is affirmed.

### O R D E R

AND NOW, this 25th day of November, 2008, the Order of the Workers' Compensation Appeal Board in the above-captioned matter is affirmed.

■

---

8. Employer argues that the WCJ merely adopted the Claimant's proposed findings of fact. It has been held, *ad nauseam,* however, that a WCJ may adopt, verbatim, findings of fact submitted by a party so long as substantial evidence in the record supports the findings. *Dillon v. Workers' Compensation Appeal Board (City of Philadelphia),* 853 A.2d 413 (Pa.Cmwlth.2004); *Jenkins v. Workmen's Compensation Appeal Board (Woodville State Hosp.),* 677 A.2d 1288 (Pa.Cmwlth.1996); *County of Delaware v. Workmen's Compensation Appeal Board (Thomas),* 168 Pa.Cmwlth. 231, 649 A.2d 491, 495 (1994), *appeal denied,* 541 Pa. 628, 661 A.2d 875 (1995). Such is the case here.