IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Diana Snyder,                              :
               Petitioner              :
                                 :
      v.                         :
                                 :
County of Allegheny and UPMC               :
Benefit Management Services, Inc.          :
(Workers' Compensation Appeal Board),:    No. 191 C.D. 2022
               Respondents            :    Submitted: August 26, 2022


BEFORE:    HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge
             HONORABLE STACY WALLACE, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON         FILED: February 3, 2023


        Diana Snyder (Claimant) petitions for review of the February 11, 2022, decision and order of the Workers' Compensation Appeal Board (Board). The Board affirmed the July 8, 2021, decision and order of the workers' compensation judge (WCJ), which denied Claimant's claim petition against the County of Allegheny (Employer) after rejecting Claimant's medical expert's testimony as non-credible. Upon review, we affirm.


## I. Factual & Procedural Background

        Claimant is a certified nurse's assistant who worked full time (with overtime) since 1992 at an assisted living facility owned and operated by Employer.

Reproduced Record (R.R.) at 35a-36a. Claimant filed a Claim Petition asserting that on March 4, 2020, she sustained a disabling work-related herniated cervical disc when reaching overhead into a patient's closet to obtain a piece of clothing for the patient. *Id*. at 3a. Claimant sought temporary total disability benefits as of March 5, 2020, and ongoing. *Id*. Employer issued a Notice of Compensation Denial on March 11, 2020, asserting that Claimant had not sustained a work-related injury, and this litigation ensued. *Id*.

Claimant testified that her job involved feeding and bathing patients and changing their clothing. R.R. at 38a. She had to lift, pull, maneuver, and roll over patients as needed and walk with them from area to area. *Id.* at 38a-39a. She had to reach overhead regularly to get patients' clothing and personal items off shelves and from cupboards. *Id.* at 39a. Before the incident, she had worked 16-hour shifts with no problems, although she acknowledged that she occasionally had aches and pains. *Id*. at 68a-70a.

On March 4, 2020, one of her patients needed to be changed. R.R. at 42a. While holding the patient's hand with her right hand to keep the patient stable, Claimant reached up overhead with her left arm extended to the patient's cupboard to get fresh underwear and clothing. R.R. at 42a & 59a. Claimant testified that while doing so, she twisted her whole body (not just her neck), which she stated was "proper mechanics," but she felt a sharp pain in the left side of her neck radiating to where her neck met her left shoulder. *Id.* at 41a & 61a-63a. She finished her shift as best she could. *Id*. at 46a & 67a.

Claimant stated that she woke up the next morning feeling excruciating and unbearable pain in her neck and left shoulder down into her arm and hand. R.R. at 48a, 69a, & 72a. She called Employer and told them she couldn't come in and

2

was going to the emergency room due to the pain. *Id.* Her son had to help her get dressed and drive her to St. Clair Hospital. *Id.* at 49a. She was given a pain medication with codeine, but it did not help and made her nauseated. *Id.* at 49a & 73a.

Claimant subsequently saw Dr. Manning, an orthopedist who had operated on her left shoulder in 2014 for an issue close to her bicep muscle. R.R. at 50a-51a & 53a. Dr. Manning admitted her to the hospital and brought in Dr. Carmen Petraglia to see her. *Id.* at 52a-53a. She underwent neck surgery the following Monday. *Id.* at 54a.

During the summer, Dr. Petraglia released Claimant to work with restrictions on lifting anything more than one pound with her left arm. R.R. at 89a. She returned to work with these limitations for three days, but had pain and swelling in her neck, shoulder, and arm. *Id.* Dr. Petraglia gave her a sling for her left arm, but Employer declined to accommodate her and sent her home. *Id.* at 90a.

Claimant underwent a second neck surgery with Dr. Petraglia in September 2020. *Id.* at 91a. After her second surgery, Claimant still had pain in her neck down into her left arm, could not drive, wore a neck brace, and could not lift or reach with her left arm. R.R. at 112a-20a. She eventually returned to work with Employer in the entry area taking temperatures of employees and visitors due to the ongoing COVID-19 pandemic; she earned the same hourly wage but got no overtime. *Id.* at 137a. Nerve block injections had not helped her pain; she still had swelling and could not lift with her left arm. R.R. at 155a-61a. She did not feel able to do her former patient care duties due to her ongoing condition. *Id.* at 159a.

Dr. Petraglia testified as Claimant's treating doctor. Certified Record (C.R.) #23 at 235-288.[1] He is licensed in Pennsylvania and board certified in orthopedic surgery with a specialty in spinal surgery. *Id*. at 242. He initially recalled that when he first saw Claimant in March 2020, she described the incident to him as "an upward-twisting injury with her arms overhead trying to lift something heavy from a shelf." *Id*. at 244-45 & 259. He deduced that her issue was likely cervical, which was confirmed by imaging studies that showed a large disc herniation that he concluded was traumatic in nature. *Id*. at 244 & 252. Several days later, he performed an anterior cervical discectomy and fusion at C5-6, which further confirmed his herniation diagnosis. *Id*. at 246-47.

Dr. Petraglia stated that Claimant had not told him of any prior history of left arm pain and numbness before the incident she described, so he concluded that the herniation had been caused by the work incident. C.R. at 249 & 258. He acknowledged, however, that he had not seen any records of prior treatment to her left arm, that if she had prior left arm issues it would "undermine" his view of the incident being the cause, and that his view of causation was dependent on the accuracy of her reported history. *Id*. at 259, 261, 264, 266 & 287. He also conceded that Claimant's initial cervical MRI from March 5, 2020, showed significant multi-level degenerative changes, although C5-6 had "more of a soft-tissue component" and was the most affected level. *Id*. at 263.

When asked on cross-examination to clarify the mechanism of injury as Claimant reported it to him, Dr. Petraglia stated that his understanding was that she had "twisted her—basically her neck and her upper body. She sort of described it like . . . a sort of a lifting movement . . . with both arms overhead." C.R. at 259-

---

[1] Citations to Certified Record indicate electronic pagination.

4

60. He acknowledged that his initial recollection that she had been lifting something heavy was incorrect. *Id*. at 260 & 277-79. However, he noted that the weight of what Claimant was lifting might not matter, as disc herniations can occur mechanically based on body movement, and "it was the rotation of her neck and just an abnormal alignment" that caused her pain. *Id*. at 265-66, 279 & 286. Dr. Petraglia maintained that as a result of the March 4, 2020, incident, Claimant sustained a traumatic cervical disc herniation at the C5-6 level. *Id*. at 244-47.

Dr. Petraglia performed Claimant's second surgery in September 2020, extending the fusion to include C4-5 and C3-4, which are adjacent to C5-6. C.R. at 250. He explained that the first surgery had been a "less is more" approach to treat the herniation at C5-6; he believes it did help her, but stated that afterwards, arthritic issues at the neighboring levels "seemed to advance rather quickly, which I think was part of the problem from the beginning." *Id*. at 251.

Dr. D. Kelly Agnew, M.D., testified for Employer in a March 24, 2021, deposition. C.R. #30 at 329-82. He is licensed in Pennsylvania, board certified in orthopedic surgery, and performs mostly hip and knee reconstruction surgery. *Id*. at 331-32. He sees patients with cervical issues in his general orthopedics practice but does not perform cervical surgery any longer because he does not prefer it. *Id*. at 333. He does 5-7 medical examinations for litigation per week, about 46 weeks per year. *Id*. at 334. He acknowledged having social interactions with the managing partner and head of workers' compensation at Employer's attorneys' Pittsburgh office because their sons were the same age and friends. *Id*. at 371-72.

Before seeing Claimant for a medical examination, Dr. Agnew conducted a medical records review, which reflected that before March 2020, Claimant underwent arthroscopic surgical treatment in July 2013 for pain,

5

numbness, and tingling in her left bicep. C.R. at 336. She underwent further treatment in 2013, another procedure on her left shoulder and clavicle in March 2014, and still reported ongoing left shoulder issues as late as July 2016. *Id*. at 336-37. Dr. Agnew concluded from Claimant's records that she had cervical nerve root compression well before the March 2020 incident. *Id*. at 337. Dr. Agnew also reviewed the accident report and Claimant's testimony and records regarding the March 2020 incident. In the accident report, Claimant asserted that her initial pain after the incident was in her left shoulder and not her arm. C.R. at 338.

Dr. Agnew reviewed Claimant's medical imaging studies. The March 5, 2020, MRI film reflected diffuse age-related degenerative cervical changes but no acute or traumatic conditions. C.R. at 340 & 343. After the first surgery in March 2020, an August 2020 MRI showed ongoing degenerative changes; after the second surgery in September 2020, Dr. Petraglia's report indicated no traumatic findings. *Id*. at 341-42.

Dr. Agnew examined Claimant in January 2021. C.R. at 344. Consistent with her testimony, she told him that she was not twisting her neck or lifting anything heavy during the March 2020 incident. *Id*. He did not observe her generally as presenting with or exhibiting any pain or discomfort. *Id*. at 346. She reported pain when he palpated her cervical and upper left extremity areas and during range of motion tests, but he detected no spasms, and her reported pain did not correlate anatomically with a cervical injury or conditions. *Id*. at 346-47 & 357-59. He detected no atrophy that would indicate she was not using her left arm regularly. *Id*. at 348. He took updated images that showed a normal post-operative status with no objective complications or ongoing issues. *Id*. at 349.

6

Based on Claimant's recollection of the incident and his records review and examination, Dr. Agnew concluded there was no mechanism of injury from the March 2020 incident that would have caused a disc herniation, nerve damage, or aggravation of previous conditions. C.R. at 350-51. He stated that Claimant's imaging showed degenerative rather than acute findings. *Id*. at 351. He added that if Claimant sustained an acute cervical injury on March 4, 2020, she would have immediately felt radiating pain in her arm and forearm down into her hand and fingers. *Id*. at 352-53. However, Claimant reported only a "pinching sensation in her trapezius muscle" area on the date of the incident and was able to finish her shift after the incident without accommodations. *Id*. at 353 & 379. Although she developed radicular pain the next day, Dr. Agnew could not relate that to the relatively unremarkable incident of reaching overhead without twisting or lifting anything heavy, as Claimant described it from the day before. *Id*. at 353 & 380. He opined that Claimant's disability was due to degenerative cervical conditions rather than a work-related incident. *Id*. at 354 & 362. He reiterated that in the absence of lifting, twisting, or sudden extreme neck movement (like a strong sneeze or cough) the incident ("reaching just overhead level with one hand") could not cause Claimant's disability or need for two surgeries at multiple disc levels. *Id*. at 354-56.

The WCJ credited Claimant's testimony of the incident and her symptoms. R.R. at 12a. However, the WCJ rejected as non-credible Dr. Petraglia's testimony that the incident caused Claimant's symptoms and ultimate need for two surgeries. *Id*. at 13a. The WCJ specifically pointed to Dr. Petraglia's opinion that Claimant's condition was caused by a twisting motion of her neck during the incident even though Claimant testified expressly that she had not twisted her neck. *Id*. By contrast, the WCJ credited Dr. Agnew's testimony as supported by and

7

consistent with the medical records and Claimant's testimony. *Id*. at 14a-15a. The WCJ therefore concluded that Claimant had failed to establish a causal relation between the work incident and her injury and disability and denied her claim petition. *Id*. at 15a-16a.

On Claimant's appeal, the Board affirmed. R.R. at 20a. The Board found the WCJ did not err in concluding that Dr. Petraglia's testimony was insufficiently credible to sustain Claimant's medical burden on her claim petition. *Id*. at 26a. Claimant timely appealed to this Court.

## II. Discussion

A claimant has the burden of proving all necessary elements to support an award in a claim petition proceeding. *Rite Aid Corp. v. Workers' Comp. Appeal Bd. (Bennett)*, 709 A.2d 447, 449 (Pa. Cmwlth. 1998). This Court reviews a WCJ's adjudication to determine whether the necessary findings of fact are supported by substantial evidence, whether procedures were violated, whether constitutional rights were violated, or whether an error of law was committed. *MV Transp. v. Workers' Comp. Appeal Bd. (Harrington)*, 990 A.2d 118, 120 n.3 (Pa. Cmwlth. 2010). The WCJ has exclusive province over questions of credibility and a reviewing court is not to reweigh the evidence or review the credibility of witnesses. *City of Phila. v. Workers' Comp. Appeal Bd. (Reed)*, 785 A.2d 1065, 1068 (Pa. Cmwlth. 2001). The WCJ may accept or reject the testimony of any witness in whole or in part. *Id*.

8

## A. Medical Evidence of Causation

The claimant's burden in a claim petition proceeding includes establishing a causal relationship between a work-related incident and an injury resulting in disability. *Somerset Welding & Steel v. Workmen's Comp. Appeal Bd. (Lee)*, 650 A.2d 114, 117 (Pa. Cmwlth. 1994). Where the causal connection between the incident and the injury is not obvious, the claimant must present expert medical testimony to establish that connection. *Rife v. Workers' Comp. Appeal Bd. (Whitetail Ski Co.)*, 812 A.2d 750, 754 (Pa. Cmwlth. 2002).

If a medical expert's opinion depends on false or incorrect information or an assumption contrary to the facts and evidence, such as a mistaken understanding of the work incident, it can be deemed incompetent. *Cmty. Empowerment Ass'n v. Workers' Comp. Appeal Bd. (Porch)*, 962 A.2d 1, 8 n.7 (Pa. Cmwlth. 2008); *see also Newcomer v. Workers' Comp. Appeal Bd. (Ward Trucking Corp.)*, 692 A.2d 1062, 1066 (Pa. 1997) (concluding that doctor's testimony on causation lacked competence because it was unsupported by the factual history of the incident). The competency of medical testimony is a question of law that we may address. *Pryor v. Workers' Comp. Appeal Bd. (Colin Serv. Sys.)*, 923 A.2d 1197, 1203 (Pa. Cmwlth. 2006).

However, if the medical expert's opinion is based on an incomplete (rather than false or inaccurate) grasp of the facts, the defect will go to the WCJ's evaluation of the weight of the expert's testimony, which may not be disturbed on appeal. *Degraw v. Workers' Comp. Appeal Bd. (Redner's Warehouse Mkts., Inc.)*, 926 A.2d 997, 1002 & n.4 (Pa. Cmwlth. 2007); *see also Cmty. Empowerment Ass'n*, 962 A.2d at 8 n.7. Likewise, to the extent the doctor's testimony and the claimant's testimony are inconsistent concerning the facts of an occupational incident or

9

exposure, the question goes to the weight of the doctor's testimony, not its competency. *Helvetia Coal Co. v. Workers' Comp. Appeal Bd. (Learn)*, 913 A.2d 326, 331 (Pa. Cmwlth. 2006).

Here, the WCJ found Dr. Petraglia's testimony was undermined by a "fatally incomplete understanding of the mechanism of injury in this case." R.R. at 13a. The WCJ first noted Dr. Petraglia's initial assertion that he believed Claimant was lifting something heavy during the incident. *Id.* at 13a-14a. The WCJ acknowledged that Dr. Petraglia corrected himself later in his deposition; however, the WCJ found Dr. Petraglia's subsequent opinion that Claimant twisted her neck during the incident was also inconsistent with Claimant's credible and specific testimony that she had not twisted her neck. *Id.* at 14a. The WCJ therefore rejected as non-credible Dr. Petraglia's opinion that Claimant's injury was caused by the incident. *Id.* By contrast, the WCJ specifically credited Dr. Agnew's testimony for Employer as fully supported by and consistent with the medical records and Claimant's testimony. *Id.* at 14a-15a. The WCJ therefore concluded that Claimant had not established a causal relationship between the incident as she described it and her subsequent disability. *Id.*

Claimant argues that the WCJ overemphasized Dr. Petraglia's initial misstatement that her injury resulted from lifting something heavy, which he corrected later in his testimony when his memory was refreshed by his treatment notes and reports. Claimant's Br. at 14-17. Claimant therefore argues that the WCJ erred in rejecting Dr. Petraglia's testimony as non-credible on the basis that he did not understand the mechanism of injury. *Id.* at 17-18.

Employer observes that while Dr. Petraglia tried to correct his initial misstatement that Claimant's injury resulted from lifting something heavy, his

10

second opinion that Claimant twisted her neck was also inconsistent with Claimant's testimony and his unresolved confusion about the mechanism of injury was a valid basis for the WCJ to reject his testimony as non-credible. Employer's Br. at 10-11. Claimant does not address the contradiction between Dr. Petraglia's subsequent testimony that the injury occurred because Claimant was twisting her neck and her own testimony that she had not twisted her neck. *See id.* at 13-18.

Our review of the record reflects that Dr. Petraglia's testimony was based on an incorrect understanding of the facts of the incident. Claimant testified specifically that she had not twisted her neck during the incident, yet Dr. Petraglia described the mechanism of injury three times as involving twisting of Claimant's neck. Claimant argues that the WCJ wrongly focused on Dr. Petraglia's initial incorrect recollection that the injury involved heavy lifting, but the WCJ's decision clearly explains that Dr. Petraglia's testimony could not establish causation because his second view that Claimant twisted her neck during the incident was directly contradicted by Claimant's credible testimony to the contrary. R.R. at 14a. This is properly characterized as a lack of competence in the testimony. *See Cmty. Empowerment Ass'n*; *Newcomer*.

We recognize that the incident as described by Claimant occurred the day before she began feeling disabling pain and that Claimant's failure to report any prior left arm issues to Dr. Petraglia led him to believe the incident was the cause of her condition. C.R. at 249 & 258. When the connection between the incident and the disability is not immediate or obvious, temporal proximity alone is insufficient to establish causation. *See Moyer v. Workers' Comp. Appeal Bd. (Pocono Mtn. Sch. Dist.)*, 976 A.2d 597, 599-600 (Pa. Cmwlth. 2009). If a physician bases his opinion of causation in part on the temporal proximity of an event, his opinion will be

11

deemed competent if he provides other factors to support his position. *Thomas Jefferson Univ. Hosp. v. Workmen's Comp. Appeal Bd. (Giordano)*, 541 A.2d 1171 (Pa. Cmwlth. 1988). Here, however, the only other aspect of Dr. Petraglia's causation testimony was his misunderstanding of the incident and mechanism of injury. Therefore, his causation opinion could not be rehabilitated.

However, the WCJ's rejection of Dr. Petraglia's testimony as non-credible rather than incompetent did not amount to reversible error. This Court has explained that a medical opinion based on a mistake concerning the incident or mechanism of injury *can* (but need not) be deemed incompetent. *Degraw*, 962 A.2d at 1002 n.4; *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transport)*, 828 A.2d 1043, 1053 (Pa. 2003) (stating that determination of an expert's credibility may be based on numerous factors, including if their opinion is based on "erroneous factual assumptions"). Also, to the extent Dr. Petraglia's causation opinion may be characterized as based on incomplete evidence or even simply as inconsistent with Claimant's testimony, those considerations go to weight and credibility, as explained in *Degraw* and *Helvetia Coal*. As such, the WCJ was within his discretion to give Dr. Petraglia's testimony little or even no weight and credibility in light of the insufficiency of his information and its inconsistency with Claimant's testimony. The WCJ therefore did not err or abuse his discretion in rejecting Dr. Petraglia's testimony as part of his overall evaluation of the weight and credibility of Claimant's evidence.

12

## B. Expert Qualifications and Bias

The "reasoned decision" requirement is found in Section 422(a) of the Workers' Compensation Act (Act),[2] which states, in relevant part:

> All parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached. The [WCJ] shall specify the evidence upon which the [WCJ] relies and state the reasons for accepting it in conformity with this section. When faced with conflicting evidence, the [WCJ] must adequately explain the reasons for rejecting or discrediting competent evidence . . . . The adjudication shall provide the basis for meaningful appellate review.

77 P.S. § 834; *see also Daniels*, 828 A.2d at 1053. Where witnesses provide conflicting testimony, a WCJ must articulate some "actual objective basis" for his credibility determination. *Id.* at 1053. Objective factors that may support a WCJ's credibility determination include whether the expert's opinion is based on erroneous factual assumptions, whether the expert has a bias or interest in the matter, and whether the expert is more or less qualified than the opposing party's expert. *Id.* A WCJ's reasons must be supported by the record and allow consideration on appeal without requiring the appellate tribunal or court to "imagin[e] why the WCJ did not believe a witness." *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 78-79 (Pa. Cmwlth. 2012). However, the WCJ need not "give a line-by-line analysis of each statement by each witness, explaining how a particular statement affected the ultimate decision." *Gumm v. Workers' Comp. Appeal Bd. (J. Allan Steel)*, 942 A.2d 222, 228 (Pa. Cmwlth. 2008).

---

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 834.

Generally, a physician is competent to testify in specialized areas of medicine even though that physician is not a specialist in, or certified in, those fields. *Sch. Dist. of Phila. v. Workers' Comp. Appeal Bd. (Hilton)*, 84 A.3d 372, 375 (Pa. Cmwlth. 2014). The qualifications and potential biases of an expert go to the weight and credibility of his testimony, which is for the factfinder to resolve. *Grube v. Workers' Comp. Appeal Bd. (Consol. Specialties)*, 667 A.2d 1224, 1228 (Pa. Cmwlth. 1995); *Duquesne Light Co. v. Workmen's Comp. Appeal Bd. (Zalar)*, 492 A.2d 1176, 1177 (Pa. Cmwlth. 1985).

Claimant argues that the WCJ erred in rejecting the testimony of Dr. Petraglia, who specializes in spinal and neck injuries and surgeries, because Dr. Agnew specializes in hip and knee conditions and was less qualified than Dr. Petraglia concerning the medical issues here. Claimant's Br. at 19-20. Claimant also avers that the WCJ should have explained why he credited Dr. Agnew's testimony even though as a friend of the senior and managing attorney in Employer's law firm, Dr. Agnew was likely biased in Employer's favor. *Id.* Employer responds that the WCJ's decision was sufficiently reasoned and that Claimant's arguments in this respect are misplaced efforts to have this Court displace the WCJ's conclusions and reweigh the evidence. Employer's Br. at 12-14.

Neither the WCJ nor the Board addressed Claimant's allegations concerning Dr. Agnew's qualifications and potential bias, although Claimant raised the issue in her appeal to the Board. C.R. at 40. However, we are able to resolve this issue based on the record and our precedent.

Regarding qualifications, both Dr. Petraglia and Dr. Agnew are board-certified orthopedic surgeons licensed in Pennsylvania. C.R. at 242 & 331. Dr. Petraglia testified that 99% of his practice is in spinal surgery. *Id.* at 242. Dr. Agnew

14

testified that his office practice is in general orthopedics and his surgical practice is largely focused on hip and knee issues. *Id.* at 332. However, Dr. Agnew's non-specialty in spinal issues did not preclude his testimony in this matter, as he is a board-certified orthopedist. *See Sch. Dist. of Phila.*, 84 A.3d at 375. Any purported deficiency in his qualifications went to the weight of his testimony, which was for the WCJ to decide. *Grube*, 667 A.2d at 1228.

Regarding bias, Dr. Agnew acknowledged his social interactions with the managing partner and head of workers' compensation at Employer's attorneys' Pittsburgh office because their sons are the same age, had activities together as children, and remained friends through college. C.R. at 371-72. However, as with Dr. Agnew's qualifications, any alleged bias related to the weight of his testimony is a matter for the WCJ to determine. *Grube*, 667 A.2d at 1228.

The essence of the reasoned decision requirement is that the WCJ's explanation for accepting the testimony of one expert over that of another must be sufficiently articulated and supported in the record. *Amandeo*, 37 A.3d at 78-79. The WCJ's reason for finding Dr. Agnew's testimony more credible and deserving of greater weight than Dr. Petraglia's had nothing to do with Dr. Agnew's qualifications or potential bias. Rather, Dr. Petraglia's "fatally incomplete understanding of the alleged mechanism of injury in this case," which was inconsistent with Claimant's credible testimony describing the incident, doomed his testimony in the WCJ's estimation. R.R. at 13a-14a. As such, the WCJ sufficiently explained why he concluded Claimant did not meet her burden of proof to show that the incident caused her subsequent symptoms and disability. The WCJ's explanation was clear and supported by evidence of record. Therefore, the WCJ produced a reasoned decision, and Claimant's argument in this regard is meritless.

15

## C. WCJ's Discussion of Claimant's Preexisting Conditions

In workers' compensation matters, it is standard practice for the WCJ's decision to summarize witnesses' testimony in the "findings of fact" portion of a decision. These summaries alone, however, are not considered actual findings of fact unless they are accompanied by specific credibility determinations and evaluations of the evidence, which are usually at the end of the "findings of fact" section. *Amandeo*, 37 A.3d at 76 (stating that "while summaries of testimony alone would be insufficient to satisfy the reasoned decision requirement, where a WCJ summarizes testimony and also objectively explains his credibility determinations, the decision will satisfy the requirement."); *see also Gabriel v. Workmen's Comp. Appeal Bd. (No. 1 Contracting Corp.)*, 518 A.2d 895, n.1 (Pa. Cmwlth. 1986) (stating that "[a] recitation of the testimony of a witness does not constitute a finding of fact.").

Claimant argues that the WCJ's decision made an "unsupported suggestion" in Finding of Fact 13a that Dr. Petraglia's lack of knowledge of Claimant's prior left arm issues damaged his credibility. Claimant's Br. at 22. Claimant asserts that her past treatment to her left arm was minimal and irrelevant to whether she sustained an acute and traumatic cervical herniation due to the March 2020 incident. *Id*. Claimant emphasizes that Dr. Petraglia observed the herniation personally when he performed surgery on her shortly thereafter. Claimant's Br. at 23-24. Claimant adds that the WCJ's alleged emphasis on her past left arm issues was misplaced because she was working full duty plus almost 20 hours each week of overtime in patient care prior to this incident, therefore her history of left arm treatment was even less relevant here. *Id*. at 24.

16

Employer responds that Claimant's assertions are little more than an improper attempt to have this Court second-guess the WCJ and reweigh the evidence. Employer's Br. at 9-10. Employer adds that the WCJ's determination that Claimant did not meet her claim petition burden was based on Dr. Petraglia's misunderstanding of the mechanism of injury, not on Claimant's prior left arm and shoulder issues. *Id*. at 13.

During cross-examination, Dr. Petraglia was asked: "You indicated that she gave you a history of having no kind of antecedent pain, I believe is the word you used, prior to this event on March 4, 2020. Is that correct?" Dr. Petraglia answered: "Correct." C.R. at 258. He was next asked: "So she told you she never had any problems with pain going down into the left arm and into the left hand prior to March 4, 2020?" He answered: "She never—not that I know of. No. the first time I met her—yeah, she never did." *Id*. He was next asked: "Have you reviewed any medical records relative to treatment she had for her—for her left shoulder, which predated March 4, 2020?" He answered: "No, I didn't have any." *Id*. at 258-59. He was next asked: "So you wouldn't know if those records contained reference to her having the symptoms down her left arm into the left hand prior to March 4, 2020[?]" He answered: "Correct." *Id*. at 259.

Finding of Fact 13a from the WCJ's decision summarizes that part of Dr. Petraglia's cross-examination testimony as follows:

> Dr. Petraglia conceded that despite his testimony [that] the Claimant had no antecedent symptoms down into her upper left extremity, he had not reviewed any of the records for the Claimant's left shoulder treatment, which predated the alleged date of injury in this case, and he did not know whether they contained any reference to radicular pain in [Claimant's] left upper extremity.

R.R. at 7a.

17

The WCJ's characterization of this portion of Dr. Petraglia's testimony in Finding of Fact 13a was accurate and supported by the deposition transcript; it was neither critical nor editorial. It appeared in the "findings of fact" section of the decision, but was simply part of the recitation of the evidence of record. It never became an actual "finding of fact" pursuant to *Amandeo* and *Gabriel* because it was not the basis for the WCJ's ultimate determination that Dr. Petraglia's testimony was not credible. As discussed above in sections "A" and "B," the WCJ rejected Dr. Petraglia's testimony due to Dr. Petraglia's conclusion that Claimant's injury was caused by twisting her neck during the incident, which contradicted Claimant's credible testimony that she had not twisted her neck. Because the WCJ neither mischaracterized Dr. Petraglia's testimony in this regard nor relied on it to decide the case, Claimant's argument in this regard is meritless.

### III. Conclusion

Based on the foregoing discussion, we affirm the Board's decision.

_____
CHRISTINE FIZZANO CANNON, Judge

18

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Diana Snyder, :
            Petitioner :
                     :
          v. :
                     :
County of Allegheny and UPMC :
Benefit Management Services, Inc. :
(Workers' Compensation Appeal Board),:   No. 191 C.D. 2022
          Respondents :

## O R D E R

      AND NOW, this 3rd day of February, 2023, the February 11, 2022, order of the Workers' Compensation Appeal Board is AFFIRMED.

 

 

_____
CHRISTINE FIZZANO CANNON, Judge